## AFFIDAVIT OF BRIAN OPPEDISANO

I, Brian Oppedisano, being duly sworn, depose and state as follows:

1.      I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I have been employed as an ATF Special Agent since July 2002 and am currently assigned to the Boston Group III Field Office. As an ATF Special Agent my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by felons and other prohibited persons, and the use of firearms in drug trafficking and violent crimes, as well as the investigation of the violation of laws related to explosive and incendiary (arson) fires. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. I have participated in numerous classes of in-service training relating to firearms trafficking investigations and arson and explosives investigations. I have been the affiant and/or participated in the execution of numerous state and federal search and arrest warrants pertaining to violations of the federal firearms, arson and explosives laws.

2.      This affidavit is submitted in support of a criminal complaint charging Andrew S. GORDON (DOB: 6/19/1962) with use of the mail and telephone to solicit the commission of a murder, in violation of Title 18, United States Code, Section 1958(a).

3.      I also submit this affidavit in support of an application for the issuance of a Search Warrant authorizing the search of four plastic bags now located in the office of Frank Bourgeois, Deputy Chief of the Sheriff's Investigations Unit at the Middlesex House of Correction. The four plastic bags contain personal items removed from in and around the bunk used by Andrew S. GORDON, which was Bunk #013 in Dorm 3 at the Middlesex House of Correction, and further described in **Attachment A.**

4.      This affidavit is based on my personal knowledge, information provided to me by other

ATF agents and law enforcement officers, as well as information provided to me by cooperating witnesses. This affidavit is not intended to set forth all of the information that I and other law enforcement personnel have learned during this investigation, but rather consists of that information necessary to provide the requisite probable cause.

**Background**

5.       GORDON is currently incarcerated as a pretrial detainee at the Middlesex House of Correction, in Billerica, Massachusetts. He is awaiting trial in connection with a pending case in Middlesex Superior Court, in which he is charged with Witness Intimidation, Stalking, Criminal Harassment, Malicious Destruction of Property and Solicitation of a Felony (solicitation to commit murder). The victim of the alleged offenses is his estranged wife. GORDON has been in custody at the Middlesex House of Correction in Billerica, Massachusetts since October 2014. The state charges are the result of a 2014 undercover investigation conducted by the Massachusetts State Police (MSP) and the Chelmsford Police Department that revealed that GORDON was actively searching to hire a "hit man" to murder his wife. As part of the MSP investigation, Trooper ▇▇▇▇▇▇▇ acted in an undercover capacity as a "hit man" and met with ▇▇▇▇▇ to arrange the "hit." After the undercover meeting between Trooper ▇▇▇▇▇ and ▇▇▇▇▇, MSP arrested ▇▇▇▇▇ for the solicitation to murder his wife. ▇▇▇▇▇ was indicted for the above State offenses and is awaiting trial.

**Cooperating Witness**

6.       On December 17, 2014, I was notified that the MSP assigned to the Middlesex County District Attorney's Office received a letter that was written by an inmate (herein referred to as CW) at the Middlesex House of Correction in Billerica, Massachusetts. The letter was sent from the CW to his attorney. The CW's attorney forwarded the letter to the MSP. In summary, the

CW wrote that a fellow inmate (later identified as GORDON) approached the CW for help in a murder for hire plot. The letter indicated that GORDON'S intended target was a state police detective (later identified to be Trooper

7.        The CW also is a pretrial detainee at the Middlesex House of Correction in Billerica, Massachusetts. He is charged in the Middlesex Superior Court with aggravated rape and assault with a dangerous weapon (knife). He has previous convictions for assault with a dangerous weapon and assault and battery. The CW is a foreign national without legal status in the United States. The CW has been made no promises for his cooperation in the instant investigation. Law enforcement has paid the CW approximately $200 over a three month period for his cooperation. I know the identity of the CW, and I anticipate that the CW will be available to testify at any pretrial hearing or trial. I have not used his name in this affidavit in order to ensure his safety.

**Interview of Cooperating Witness**

8.        On December 17, 2014, MSP Trooper Gerald Collins, MSP Lieutenant Paul Bulman, and I interviewed the CW at the Middlesex House of Correction in Billerica, Massachusetts. The CW confirmed that he wrote the letter to his attorney and did so because he did not want a policeman to get hurt or killed. The CW told us that he is currently housed in Dorm 3 with fellow inmate Andrew GORDON. He positively identified GORDON from a single photograph shown to him.

9.        The CW said that he and GORDON have had a friendly relationship for approximately the last two or three months since they have been housed together in Dorm 3. The CW specifically recalled a conversation that he and GORDON had on or around Sunday, December 7, 2014. The CW explained that GORDON asked if he knew anyone who "had the balls to kill." GORDON offered that he would pay someone to kill the police officer and a witness who were

both involved in his case. GORDON told the CW that if the police officer and witness were eliminated that his case could be severely weakened. GORDON told the CW that the police officer's name was "⬛⬛⬛⬛" and described the kind of vehicle Trooper ⬛⬛ drove. GORDON went on to tell the CW that he would make a down payment for the "hit" by having the hit man send a bill to his business.

10.     The CW told us that prior to speaking with law enforcement he told GORDON that he had a cousin on the outside, an MS-13 gang member, who was "on the run," and who would be interested in taking the contract for the murder. The CW told us that GORDON had repeatedly asked him if he had spoken with his cousin yet about the "hit." GORDON expressed to the CW how angered he was for being set up by the MSP. The CW told us that he fabricated the story about his cousin in an attempt to prevent GORDON from asking other inmates to commit the murder for hire. The CW stated he later discovered that GORDON was also speaking to fellow inmate ⬛⬛⬛⬛" about the solicitation to murder Trooper ⬛⬛ and a second individual identified as ⬛⬛⬛⬛, a witness in GORDON's current State case.

**Mail Cover**

11.     Due to the serious nature of the murder for hire allegations, a "mail cover" was established by the Middlesex Sheriff's Office (MSO) to review all incoming and outgoing mail for GORDON. On January 15, 2015, Trooper Collins and I were notified by the MSO that they intercepted an outgoing letter from GORDON addressed to ⬛⬛⬛⬛, Massachusetts. In the letter, GORDON asked ⬛⬛⬛⬛ to obtain a money order in the amount of $3,580 and have it paid to the order of ⬛⬛⬛⬛. GORDON further asked ⬛⬛ ⬛⬛ to have the money order appear as though it was sent from ⬛⬛⬛⬛

**Interview of** [REDACTED]

12.     On January 15, 2015, Trooper Collins and I interviewed [REDACTED], an inmate at the Middlesex House of Correction in Billerica, Massachusetts. [REDACTED] explained that he is housed with GORDON in Dorm 3. [REDACTED] further explained that GORDON placed a "hit" on [REDACTED] and a second individual [REDACTED] who was cooperating with police. GORDON offered to pay [REDACTED] bail as a down payment toward the "hit." GORDON told [REDACTED] that he would pay a total of $20,000 to have both Trooper [REDACTED] and Mr. [REDACTED] killed. GORDON told [REDACTED] that if Trooper Graham and [REDACTED] "go away" then his problems will also "go away."

13.     [REDACTED] told Trooper Collins and me that his total bail amount was $3,580, the same amount GORDON had asked [REDACTED] to send in a money order. [REDACTED] told Trooper Collins and me that GORDON provided him with a hand written note that included information to assist in locating Trooper [REDACTED]

14.     [REDACTED] also was a pretrial detainee at the Middlesex House of Correction in Billerica, Massachusetts. He was the subject of a pending case in Woburn District Court. This case was recently adjudicated and [REDACTED] was convicted of Reckless Endangerment of a Child and motor vehicle offenses. [REDACTED] has a lengthy criminal history dating to 1996. His previous convictions include malicious destruction of property, assault and battery on police officer, assault and battery, failure to register as a sex offender, violation of a restraining order, larceny, assault with a dangerous weapon, resisting arrest, indecent assault and battery on a child, and possession of Class B.

**GORDON'S Note to** [REDACTED]

15.     On January 16, 2015, Trooper Collins and I obtained from [REDACTED] he note tha [REDACTED] had

described. The note read:

> *"Trooper*
> *Andrew*
> *Middlex District Attorney*
> *State Police Detective Unit*
>
> *Tyngsborough, MA"*

I compared the writing on the note to known samples of GORDON'S writing and noted that

the writing on the note appeared to be consistent with GORDON's writing.

### Interview of Cooperating Witness & GORDON'S Note to Cooperating Witness

16.     On January 30, 2015, Trooper Collins and I met with the CW at the Middlesex House of

Correction in Billerica, Massachusetts. The CW provided us with a hand written note that he had

previously received from GORDON. The note was written on white lined paper and appeared to

be consistent with the known writing of GORDON. The note read:

> *Tyngsborough, MA*
> *Married*
> *Gun Collection*
> *Works at*
>
> *"Trooper Andrew Graham*
> *Middlesex District Attorney*
> *State Police Detective Unit"*

In the left margin next to          information the following was written:

> *"Has to be an accident like a house fire"*

In the left margin next to Trooper          information the following was written:

> *"Line of duty"*

17.     The CW provided Trooper Collins and me with the date and time that GORDON gave

him the note. Based on the date and time provided to us by the CW, Trooper Collins and I reviewed surveillance video of Dorm 3 for Friday, January 16, 2015, between 9:00 p.m. and 10:30 p.m. The video showed GORDON standing at his bunk writing on paper. GORDON was shown wearing blue-colored latex gloves while writing on the paper. The video showed GORDON fold the paper, walk over to the CW's bunk, and appear to bend over and leave the paper there. The video goes on to show the CW walk to his bunk and retrieve what GORDON had left there.

## Interview of Cooperating Witness & Additional Notes from GORDON

18.     On February 6, 2015, Trooper Collins and I met with the CW at the Middlesex House of Correction in Billerica, Massachusetts. The CW informed us that GORDON had been moved from Dorm 3 to Dorm 4 due to an altercation. Trooper Collins and I received confirmation from MSO that GORDON was moved on February 2, 2015, due to an altercation with

19.     The CW explained that prior to the move, GORDON became suspicious that someone in the house of correction was cooperating with the police and confronted         bout this. Due to the accusations the house of correction staff separated

20.     On February 6, 2015, the CW provided Trooper Collins and me with additional hand written notes that he received from GORDON. GORDON provided the information on the notes so that CW could provide it to his cousin                      on the outside.

The first note read:

> *"Trooper Andrew Graham*
> *Middlesex District Attorney*
> *State Police Detective Unit*
> *Silver Ford F-150 Truck*
> *About 30 years old*
> *5'10"*
> *165lbs*
> *Brown hair"*

The second note read:

*Tyngsboro, MA*
*Married*
*Gun Collection*

*State Trooper*
*Middlesex District Attorney*
*Police Department*
*Age 30?"*

In the left margin next to [redacted] information the following was written:

*"Missing*
*Accident*
*Fire"*

In the left margin next to Trooper Graham's information the following was written:

*"Line of Duty"*

**Letter to GORDON**

21.     Since the CW and GORDON were now in separate housing units at the Middlesex House of Correction in Billerica, Massachusetts, Trooper Collins and I decided to contact GORDON in writing, in an undercover capacity, posing as [redacted] the fictitious cousin of the CW. The CW told Trooper Collins and me that GORDON had routinely asked him on numerous occasions about his cousin and when he was going to kill Trooper Graham and [redacted]

22.     On February 10, 2015, Trooper Collins and I drafted a letter to GORDON from [redacted] The letter was written on the inside of a Valentine's Day greeting card. The letter was drafted in a "coded" fashion. The letter read that [redacted] knew that he (GORDON) has a "problem" and that [redacted] needs "work" and gets paid to "remove snow." The letter also

questioned GORDON about where to send the "bill." The letter provided GORDON with the address of an undercover Post Office Box in Manchester, New Hampshire. GORDON was instructed in the letter that if he mailed something to [        ] to include only the address and omit the name.

## Letter to New Hampshire Post Office Box

23. On February 25, 2015, Special Agent John Forte of the ATF Manchester New Hampshire Office retrieved a letter from the previously established undercover Post Office Box. On that same date, SA Forte transferred the unopened letter to me. The envelope was addressed to the Post Office Box without an addressee name and without a return address or return name. The inside of the envelope contained a hand written letter on white lined paper. The letter read:

### *"TAKE CARE OF WORK"*

The letter was written in block style letters and in a generic fashion, so as to mask the writer's handwriting. The letter was postmarked by the United States Postal Service with the date of "18 FEB 2015."

## Video Surveillance of GORDON

24. On February 25, 2015, Trooper Collins and I, along with MSO Lt. George Karelas, reviewed video footage of Dorm 4 at the Middlesex House of Correction in Billerica, Massachusetts. Investigators viewed footage from February 12, 2015 through February 18, 2015 in an attempt to determine when GORDON received the undercover Valentine's Day greeting card. The following is a summary of video footage from February 17, 2015 from approximately 2:39 p.m. through 3:15 p.m.:

GORDON (and other inmates) received their incoming mail in the area of the Officer's Station. GORDON opened and read a piece of mail while standing in front of the Officer's Station.

GORDON walked to his bunk holding a pink-colored card that he received in the mail. GORDON sat on his bunk and put on blue latex gloves. GORDON wrote on a white pad of paper and retrieved an envelope from under his mattress. GORDON reviewed the pink colored card on several occasions while seated at his bunk. GORDON placed a folded piece of paper in an envelope and walked to a water cooler. GORDON walked to the outgoing mailbox and walked back to his bunk without the envelope. GORDON then took off his blue latex gloves.

## Intercepted Correspondence

25. After GORDON was moved from Dorm 3 to Dorm 4 and separated from the CW he attempted to contact the CW through written correspondence on several occasions. It is against the Middlesex House of Correction policy for an inmate to contact another inmate from a different unit via the mail. The letters were seized by the MSO and transferred to Trooper Collins and me.

26. On February 25, 2015, MSO Lieutenant Karelas intercepted an outgoing letter addressed to Andrew Gordon at the Middlesex House of Correction in Billerica, Massachusetts. The return name and address on the letter belonged to the CW. The handwriting on the envelope was not the CW's, but was consistent with GORDON's known handwriting. Investigators believe that the letter was in fact from GORDON and intended for the CW. As noted previously, inmates are not allowed to communicate with inmates in other dorms within the Middlesex House of Correction in Billerica, Massachusetts. One way around that prohibition is to place a letter in the house of correction mailbox using the return address of the inmate with whom you wish to communicate and placing a non-deliverable address on addressee portion of the envelope. When it is determined that the letter cannot be delivered it will be returned to the inmate indicated on the return address section of the envelope. In summary, GORDON asked the CW to let him

know if he (CW) gets the letter and instructed CW how to address a letter to send back to him (GORDON) to prevent the jail from intercepting it. In his letter, GORDON goes on to ask the following:

> *"How is your cousin?"*
> *"How is his work?"*
> *"I hope he is successful."*
> *"I am confident his clients will pay him based on his efforts."*

27.     On February 25, 2015, MSO Lieutenant Karelas intercepted a second outgoing piece of mail. The letter was addressed to:



*Newton, MA 02165"*

The return name on the envelope was CW's name along with a return address of the Middlesex House of Correction in Billerica, Massachusetts. Investigators immediately recognized that the handwriting was not the CW's and that the handwriting was consistent with GORDON's.

28.     I contacted Special Agent Robert Parker of the United States Postal Service/Office of Inspector General in an attempt to determine if the above mentioned Post Office Box existed. Special Agent Parker advised that no such Post Office Box existed with the name of Anders Gundersson from Newton, MA. A search through the Massachusetts Registry of Motor Vehicles computerized databases revealed that there was not an                          who had a MA identification card or MA driver's license. Additionally, a search of publicly available computer databases revealed no match for                          in the Commonwealth of Massachusetts. Inside of this envelope was a handwritten note on white lined paper. Trooper Collins and I determined that this letter was an attempt by GORDON to contact CW. In the letter GORDON asked how things were going and how is your family. GORDON wrote that he heard that a cousin moved to NH and asked about his job prospects.

## "Rico Silva's" Second Letter to GORDON

29.     On February 27, 2015, Trooper Collins and I drafted a second letter to GORDON from

▓▓▓▓▓▓▓ the fictitious cousin of CW. The letter was written on the inside of a

"Congratulations" greeting card. The letter was written in a "coded" manner and indicated that

GORDON's letter had been received and that they are ready to do "work." The letter included a

bill and told GORDON it was for a down payment. The letter asked GORDON which "job" he

wanted done first and which "snow" (person) is he more worried about. The letter was mailed

on February 27, 2015, at the United States Post Office located at 51 South Broadway, Salem, NH

03079.

## Second Letter to New Hampshire Post Office Box

30.     On March 3, 2015, MSO Lieutenant Karelas informed Trooper Collins and me that an

outgoing letter addressed to the undercover Post Office Box in Manchester, NH had been

intercepted. The envelope had no return address, no return name and no addressee name. Inside

of the envelope was a handwritten letter on white lined paper. The writing was written in block

style letters and in a generic manner, so as to mask the writer's handwriting. The letter read in

full:

> *"TAKE CARE*
> *OF BOTH SNOW JOBS*
> *SOON. NO TIME TO LOSE*
> *INVOICE FOR*
> *SNOW REMOVAL*
> *OF DRIVEWAY*
> *AND ROOF*
> *PAY AFTER COMPLETION*
> *OF AT LEAST ONE*
> *SEND PROOF*
> *[nick name of CW]CAN VOUCH"*

## Video Surveillance of GORDON

31.     On March 3, 2015, Trooper Collins, MSO Lieutenant Karelas, and I reviewed video

footage of Dorm 4 from February 28, 2015 through March 2, 2015, in an attempt to determine

when GORDON received the undercover "Congratulations" greeting card. The following is a

summary of video footage of Dorm 4 from March 2, 2015, from approximately 2:22 p.m.

through 2:50 p.m.:

GORDON (and other inmates) received incoming mail in the area of the Officer's Station.

GORDON opened and read a piece of mail (pink colored card) while standing in the area around

the Officer's Station. GORDON walked to his bunk holding the pink-colored card that he

received in the mail. GORDON left the pink colored card on top of an adjacent bunk.

GORDON walked to the Officer's Station, retrieved blue colored latex gloves from on top of the

desk and walked back to his bunk. GORDON put on the gloves and retrieved a white colored

pad of paper from underneath his mattress and an unknown item from his drawer. GORDON

wrote on the white pad of paper and retrieved an envelope from under his mattress. GORDON

reviewed the pink colored card on a several occasions. GORDON walked to the sink area with a

napkin or paper towel and returned to his bunk. Upon his return to his bunk it appeared that

GORDON moistened and sealed the envelope and affixed a stamp. GORDON walked to the

outgoing mailbox and walked back to his bunk without the envelope. GORDON took off his

blue latex gloves.

**Third Letter to New Hampshire Post Office Box**

32.     On March 9, 2015 MSO Lieutenant Karelas informed Trooper Collins and me that an

outgoing letter addressed to the undercover Post Office Box in Manchester, NH had been

intercepted. The envelope had no return address, no return name, and no addressee name. Inside

of the envelope was a handwritten letter on white lined paper. The writing was written in block

style letters and in a generic manner, so as to mask the writer's handwriting. The letter read in full:

> *"CABBAGE FOR YOU*
> *FROM THE FARM*
> *MORE SNOW JOBS*
> *AVAILABLE. GRAY FORD*
> *AND THE OTHER SNOW*
> *MAY GET ME TO THE*
> *FARM. PLOW VERY SOON."*

Based on our training and experience, Trooper Collins and I believe that "cabbage" is slang for money and "farm" is slang for jail.

**Third Letter to GORDON**

33. On March 11, 2015, Trooper Collins, MSO Lieutenant Karelas and I controlled and monitored a letter delivery to GORDON in Dorm 4. The letter was drafted and written by Trooper Collins and me, posing as "Rico Silva," the fictitious cousin of the CW. The letter was written inside of a Saint Patrick's Day greeting card which also contained a color photograph of Trooper           and a second trooper unrelated to the current investigation. Both troopers were standing next to a gray Ford F150 pickup truck. A question mark was written above the two troopers in an effort to have GORDON identify Trooper         as his intended target. Inside of the greeting card was a PIN number (051986) and a phone number

       or GORDON to contact       to discuss the "bill" and details of the murder for hire plot. The PIN number allows inmates to have access to make outgoing phone calls from within the jail. ATF Special Agent Richard       acting in an undercover capacity, posing as

       was briefed on the investigation and was prepared to receive a phone call from GORDON.

**Video Surveillance of GORDON**

34.      On March 11, 2015, Investigators monitored GORDON in real-time via house of

correction surveillance/security cameras. The following is a summary timeline (times are

approximates):

2:59 p.m. GORDON received his incoming mail from an officer at the Officer's Station within
Dorm 4 and walked to the couch area.  GORDON opened the undercover greeting card and
picture.
3:06 p.m. GORDON walked to his bunk, picked up a pad of paper, and put on his blue HOC
jumpsuit.
3:12 p.m. GORDON left his belongings at his bunk and departed Dorm 4 to the interview rooms
for an attorney visit.
4:17 p.m. GORDON departed from the interview room and returned to Dorm 4.  Upon his arrival
at Dorm 4, GORDON sat down and ate his dinner.
4:31 p.m. GORDON retrieved blue latex gloves from his mattress area, put the gloves on, and
looked at the undercover greeting card and photograph while at his bunk.
4:33 p.m. GORDON appeared to be writing on a white pad of paper that he retrieved from
underneath his mattress. GORDON retrieved an envelope and writing utensil from underneath
his bunk.  GORDON appeared to reference the photograph that was sent to him.  GORDON
placed a piece of paper into the envelope and moistened and sealed the envelope.  GORDON
then placed the envelope in the outgoing mailbox.
4:42 p.m. GORDON walked from his bunk, holding the undercover greeting card, to a phone
next to the couch area.
4:54 p.m. GORDON walked from the phone back to his bunk.  GORDON appeared to be
looking at one of the previously delivered undercover greeting cards.
5:00 p.m. GORDON appeared to be looking at the undercover greeting card and writing on white
pad of paper.
5:12 p.m. GORDON walked from his bunk with a second white envelope and placed it in the
outgoing mail box.
5:13 p.m. GORDON walked back to his bunk and took of his blue latex gloves

**GORDON Attempts to Call**

35.      On March 11, 2015, between 7:04 p.m. and 7:54 p.m., GORDON, who utilized the

provided                    , attempted to call Special Agent          , who was acting in an undercover

capacity and posing as                    " at the provided undercover phone number

Due to a technical problem with the undercover phone line, the calls were not completed.

36.      On March 11 at 8:05 p.m., Special Agent          received an incoming call from

          This call could not be completed.  Investigators determined that GORDON asked a fellow

inmate (PIN assigned to ▓▓▓▓▓▓▓▓▓ who was already talking on a phone in Dorm 4 to

make a 3-way call to the undercover phone number. GORDON can be heard in the background

of ▓▓▓▓▓ recorded phone call asking ▓▓▓▓▓ to make the call.

## GORDON Calls an Unidentified Male

37.     On March 11, 2015, at 9:37 p.m., GORDON placed an outgoing call to ▓▓▓▓▓▓▓

The call was recorded by the MSO per standard procedure. GORDON asked the caller (an older

male) to call a snow removal company at ▓▓▓▓▓▓▓ (the undercover phone number) and

relay the following message:

that his cousin from Billerica recommended him
that we need it done soon and that there are several jobs that need work
that payment is not possible until the end of the first job and to send proof that the first job is
done
to send a picture for proof and that he'll know what I mean
we need the jobs done soon

38.     On March 12, 2015 at approximately 4:18 PM SA ▓▓▓▓ received an incoming call on his

undercover phone from ▓▓▓▓▓▓▓ Special Agent ▓▓▓ missed the call and no voice mail

was left by the caller. On the same date at approximately 5:42 p.m., Special Agent ▓▓▓▓

contacted an unknown male  via at ▓▓▓▓▓▓▓ Special Agen ▓▓▓ advised that unknown

male that someone had previously attempted to contact him from this telephone number. The

unknown male asked Special Agent ▓▓▓ if he was the "snow removal man." Special Agent

▓▓▓ replied in the affirmative. The unknown male     provided Special Agent ▓▓▓ an

address, 4 Dennison, and stated to Special Agent ▓▓▓ that he needed to remove the snow. The

unknown male further stated that once the snow was removed he could send a bill.  Special

Agent ▓▓▓ sked the unknown male if he was going to talk to "him." The unknown male

responded in the affirmative.  Special Agen ▓▓▓ requested that the next time the unknown

male spoke with "him" via telephone that he tell "him" that he (Special Agent ▓▓▓▓▓▓▓▓

needed to speak with him. The unknown male replied that he would advise" him." This conversation was recorded. The names Gordon and [REDACTED] were never used during the conversation.

39.     On March 13, 2015, at approximately 5:57 p.m., GORDON made an outgoing phone call to [REDACTED] The call was recorded by the house of correction pursuant to standard procedure. The person with whom GORDON spoke sounded to be the same individual from the March 11, 2015 call with [REDACTED] GORDON and the March 12, 2015 call with Special Agent [REDACTED] During this call, GORDON told the man that the best time to call "that company" would be after 5:30. The man advised GORDON that he had already spoken with the "snow removal guy." The man advised GORDON that the guy wanted to speak with him directly. GORDON responded by telling the man to "call him back and tell him it's a recorded line" and it's "not a good idea to talk to him directly." GORDON went on to instruct the man to tell him that "he wants the work done" and to "finish the first job and then he'll get paid." GORDON also instructed the man to tell him that "there are two jobs, the driveway and the roof" and that he "needs the first job done before he gets paid." GORDON reiterated to the man to tell him that "it's a recorded line" and "we don't feel safe talking on the phone."

**Unknown Hispanic Male Calls** [REDACTED] **/ Special Agent** [REDACTED] **on GORDON'S Behalf**

40.     On March 12, 2015, at approximately 5:57 p.m., Special Agent [REDACTED] received an incoming call on the undercover phone ([REDACTED] This number is associated with Securus, a telecommunications company that is contracted with the Middlesex House of Correction in Billerica, Massachusetts for inmate telephone services. An unknown Hispanic male engaged Special Agen [REDACTED] in conversation inquiring if he was from a landscaping company. Special Agent [REDACTED] requested that to speak with GORDON, to which

the Hispanic male replied that GORDON was busy. The Hispanic male told Special Agent

that he (GORDON) tried to call him on numerous occasions and that he had questions for

him. The Hispanic male told Special Agent that GORDON would call him later to talk.

### Fourth and Fifth Letters to New Hampshire Post Office Box

41.     On March 12, 2015, I was informed by MSO Lieutenant Karelas that two outgoing letters addressed to the undercover Post Office Box in Manchester, NH had been intercepted. The envelopes had no return address, no return name, and no addressee name.

42.     Inside of the first envelope was the same color photograph that had been sent to GORDON on March 11, 2015. We had written a question mark over Trooper          and over a second trooper in an attempt to have GORDON identify his intended target. GORDON returned the photograph with a handwritten check mark over Trooper

43.     Inside of the second envelope was a handwritten letter on white lined paper. The writing was written in block style letters and in a generic manner, so as to mask the writer's handwriting. The letter read in full:

> *"YOU FOUND IT*
> *NO CALLS*
> *GOOD LUCK*
> *SEND PROOF OF*
> *SNOW REMOVAL"*

### GORDON'S Letter to the Cooperating Witness

44.     On the same date, another outgoing letter was intercepted by Investigators. The letter had a return address for the CW and was addressed to                               Lowell, MA 01852." The handwriting appeared similar to GORDON's. The letter contained inside appeared to be written by GORDON to the CW. In this letter, GORDON asked the CW about the undercover PIN and phone number and asked CW to "please make sure the snow is removed."

**Sixth Letter to New Hampshire Post Office Box**

45.    On March 13, 2015, MSO Deputy Chief Frank Bourgeois intercepted an outgoing letter

addressed to the undercover Post Office Box in Manchester, NH. The envelope had no return

address, no return name, and no addressee name. Inside of the envelope was a hand written letter

on white lined paper. The letter referred to having snow removed and asked how much for the

first job and second job. The letter goes on to read that payment would be made after the

completion of the first job and please work soon. The letter ended with "whose PIN #?"

**Seventh and Eighth Letters to the New Hampshire Post Office Box**

46.    On March 16, 2015, MSO Lieutenant Karelas informed Trooper Collins and me of two

outgoing letters addressed to the undercover Post Office Box in Manchester, NH. The envelopes

had no return address, no return names, and no addressee names. Inside of the first envelope was

a handwritten letter on white lined paper. In summary, the letter stated that there may be a

misunderstanding and that a driveway and roof need to be cleared of snow. The letter went on to

read that there are concerns for flooding and ice dams and that a bobcat or earthmover would be

needed.

47.    Inside of the second envelope was a handwritten letter on white lined paper. The writing

was written in block style letters and in a generic manner, so as to mask the writer's handwriting.

The letter read in full:

> *"SNOW IS MELTING*
> *SEVERAL PLOWS*
> *LOOKING FOR WORK*
> *CALLS ARE RECORDED*
> *SEND PROOF OF FIRST JOB*
> *PAYMENT FROM OUTSIDE*
> *GOOD LUCK"*

**Interview of the Cooperating Witness**

48. On March 17, 2015, Trooper Collins, MSO Lieutenant Karelas and I interviewed the CW, who informed us that he had received numerous written messages from GORDON. The CW stated that he began to receive the notes approximately three weeks previously. The CW explained that inmates from Dorm 3 and Dorm 4 have visitation at the same time and that when inmates are at visitation, the messages were passed from a Dorm 4 inmate to a Dorm 3 inmate and then brought back to Dorm 3 for delivery to the CW. The CW went on to say that inmates are routinely searched after visitation, but a small piece of paper would often not be recovered or found by house of correction staff.

**GORDON'S Notes to Cooperating Witness**

49. The CW provided us with eight handwritten notes that were delivered to him by various inmates from Dorm 3. The CW explained that when the Dorm 3 inmates returned from their visits the notes were given to the CW. The CW identified the writing to be GORDON's and noted that GORDON addressed the notes with improper spelling of the CW's name. The CW put the notes in chronological order to the best of his recollection and dated several of them upon receipt. In summary, the notes were about CW's cousin from NH, snow removal, and inquiring if the work has been completed.

50. One note dated "03-08" (March 8, 2015) by the CW was written on white lined paper. The note was written in block style letters and is consistent with previously written letters by GORDON that were addressed to the undercover Post Office Box. It should be noted that CW is not familiar or aware of this style of writing. The note read:

> *"SNOW REMOVAL*
> *HAS TO BE DONE*
> *VERY SOON CABBAGE*
> *WHEN OUT TO THE FARM"*

51. A note dated "Fri 13" (March 13, 2015) by the CW contained the following message:



*"Is this you*
*Do you know*

**Cooperating Witness's Note to GORDON**

52. Under the direction and control of Trooper and me, the CW drafted the following

note to GORDON:

"que pasa diablo the pin is good
and that's my cuz is number
my cuz is nervous about calls
from strangers"
The note was addressed to "diablo cabron"

The CW was instructed to have the note delivered to GORDON in the same manner as

GORDON was able to deliver notes to the CW.

**"Jim" Calls / Special Agent on Behalf of GORDON**

53. On March 20 and 21, 2015, Special Agent received incoming calls from

The unknown caller identified himself as "Jim" and asked SA if he was involved

with "snow removal." Special Agent told "Jim" that he needed some money and that he

needed to speak with GORDON directly.

**GORDON'S Letter to**

54. On March 20, 2015, MSO Lieutenant Karelas notified Trooper Collins and I of an

outgoing letter sent by GORDON addressed to Lieutenant Karelas

photocopied the contents and the original letter was allowed to continue on through the normal

mail process. The envelope contained two letters, both written on white lined paper. The

handwriting appeared to be consistent with GORDON's known handwriting.

55. The first letter was written to In summary, GORDON asked to send the

second attached letter to a fellow inmate in the Billerica Jail. GORDON wrote that he cannot send a letter directly to another inmate, but it is okay if she sent the attached letter from outside of the jail. In his letter to ▓▓▓ GORDON provided the CW's name and the address of the house of correction for the attached letter to be sent.

56.     The second letter, the one ▓▓▓ was instructed to mail to the CW, asked the CW how he and his family were doing. GORDON wrote that he missed Dorm 3 and that Dorm 4 is quieter and that the Correctional Officers are better. GORDON asked the CW if his cousin had moved to Manchester, NH and asked the CW to confirm his cousin's mailing address and phone number. GORDON further wrote that he is reluctant to talk on the phone and to please send a letter back through ▓▓▓

**Message from GORDON to Cooperating Witness**

57.     On March 20, 2015, I was contacted by the CW who relayed the following: CW stated that earlier in the day an inmate in Dorm 3, ▓▓▓▓▓, delivered a verbal message from Andrew GORDON. CW explained that ▓▓▓▓▓ received the message from a Dorm 4 inmate while they were both at visitation. CW stated that the message was that GORDON has sent a letter via the mail to a family member. In the letter GORDON included a second letter to be sent to the CW. The CW further stated that GORDON has asked the family member to mail the letter to CW because inmates cannot send each other letters through the mail.

**Cooperating Witness's Note to GORDON**

58.     On March 25, 2015, the CW informed me that he passed the note (previously written on March 17, 2015) to a fellow Dorm 3 inmate. The CW instructed the fellow inmate to pass the note to a Dorm 4 inmate during visitation so that it could be delivered to GORDON.

**Ninth Letter to the New Hampshire Post Office Box**

59. On March 26, 2015, I was notified by MSO Lieutenant Karelas of an outgoing letter from GORDON to the undercover Post Office Box. On March 31, 2015, I retrieved the letter that was sent to the undercover Post Office Box in Manchester, New Hampshire. The letter was post marked "28 MAR 2015" by the United States Postal Service. The writing on both the envelope and letter appeared to be consistent with the known handwriting of GORDON. The letter was written on white lined paper and was not written in block style lettering as in past letters from GORDON. The letter read in its entirety:

> *"HOW IS THE SNOW PLOW AND LANDSCAPING BUSINESS?*
> *HAVE YOU BEEN BUSY?*
> *HOW IS [CW's nick name]?*
> *WE CALLED TO CHECK ON REFERENCES, ETC.*
> *SNOW REMOVAL JOB- ROOF DRIVEWAY*
> *LANDSCAPING- LAWN, CLIPPINGS*
> *PAYMENT AFTER FIRST JOB, OR EXIT.*
> *SEND PROOF OF COMPLETION OF THE FIRST JOB*
> *LORD BLESS"*

60. On or about April 1, 2015, MSO Lieutenant Karelas informed Trooper Collins and me that GORDON had requested to be moved from Dorm 4 back to Dorm 3.

61. On April 6, 2015, at approximately 2:53 p.m., the Middlesex Sheriff's Office transferred GORDON to Dorm 3. Lieutenant Karelas and I monitored GORDON via the jail's video surveillance/security cameras during the transfer. Upon GORDON's arrival at Dorm 3, he and the CW immediately engaged in conversation. Both CW and GORDON can be observed sitting at a table together and appeared to be viewing and examining the greeting cards and letters that were previously sent to both GORDON and the CW.

**Telephone Call to ⬛⬛⬛ / Special Agent ⬛⬛⬛**

62. On April 6, 2015, at approximately 3:30 p.m., Lieutenant Karelas and I monitored and

recorded a telephone call from the CW and GORDON to Special Agent       The call was made to the undercover phone number previously provided to GORDON and the CW. Special Agent     was acting in an undercover capacity and posing as the CW's fictitious cousin       The CW advised Special Agent    that he was with "the guy" in close proximity. Special Agent    requested to speak directly with GORDON. After a short pause, in which the CW could be heard speaking to GORDON, the CW advised Special Agent    that "he," did not want to speak on the telephone. Special Agent    replied that he needed to be close. The CW responded that he was a foot away from him.

63.      During the same conversation, Special Agent    questioned the CW as to the manner in which he would be paid. After a short period of time had elapsed, during which time CW spoke to GORDON, the CW stated that he had been handed a piece of paper. The CW further stated that he (GORDON) wanted the job completed involving the guy with the truck. Special Agent    responded that it was going to cost him (GORDON) "ten thousand" and the other "five." Special Agent    could again hear the CW speaking with GORDON. Shortly thereafter, the CW advised Special Agent    that he (GORDON) said it was good.

64.      During this same conversation, Special Agent    again asked the CW how he was going to get paid. Special Agent    overheard the CW speaking with GORDON. The CW returned to the call and advised that he (GORDON) said once the job was done, Special Agent     was to send an invoice. Special Agent    questioned the CW if he (GORDON) had written down how he was to be paid. The CW replied, "Yes, he wrote it, it's all on a piece of paper."

65.      During the same conversation, Special Agent    requested that the CW ask GORDON how he was to prove to GORDON that he had completed the job. Special Agent

again overheard the CW speaking with GORDON. The CW relayed that Special Agent should send a note stating he "bought the truck." Special Agent      suggested that he could send "his girl" with photos to display to GORDON. Special Agent      heard the CW explain to GORDON what he had said. The CW returned to the telephone and said that he (GORDON) wanted a note stating he, Special Agent      had "bought the truck" and to include a newspaper article. Special Agent      questioned the CW if he (GORDON) was telling him or was writing it down. The CW responded that he was being told and that he (GORDON) spoke very quietly.

66.        During the same conversation, Special Agent      asked the CW to tell GORDON that once the call was terminated it was going to happen and that GORDON had to be sure he wanted it done. Special Agent      overheard the CW speaking with GORDON and once completed, the CW advised Special Agent      that he (GORDON) wanted it done and that he needed the second job done as well.

67.        During the same conversation, Special Agent      advised the CW that he intended to do the first job on the man without the truck and upon completion he would do the man with the truck. Special Agent      requested that the CW relay this message to GORDON. The CW complied with the request. The CW returned to the telephone and stated that he (GORDON) wanted both done. Special Agent      reiterated to the CW that once the call was terminated he was going to complete the job and wanted to be sure GORDON wanted it done. The CW stated that he (GORDON) was sure he wanted it done. Special Agent      confirmed with the CW that he would be paid. This conversation was recorded and was conducted in both English and Spanish.

68.        Lieutenant Karelas and I monitored the CW and GORDON during the above described

phone call with Special Agent ▓▓▓ I observed GORDON standing next to CW in very close proximity. I observed the CW relay the messages and questions that Special Agent ▓▓▓ had asked and observed GORDON nod his head several times in the affirmative. I observed GORDON writing notes to the CW while they were at the phone. After the phone call was completed GORDON retrieved his notes from the CW and both walked back to the bunk area.

**Interview of the Cooperating Witness**

69.    On April 7, 2015, Trooper Collins and I spoke with the CW regarding his contact with GORDON on the previous day. The CW stated that when GORDON arrived in Dorm 3 he immediately began talking to him about his cousin ▓▓▓▓ The CW stated that he and GORDON sat at a table where GORDON examined and compared the writing and the address for his ▓▓▓▓▓▓▓ from previously sent letters and greeting cards. The CW explained that GORDON still wanted ▓▓▓▓ to kill the cop and the other guy.

70.    The CW stated that soon after GORDON's transfer to Dorm 3 they both walked to the phone and called ▓▓▓ The CW stated that GORDON was writing notes to him during the call specifically about the "proof." The CW explained that GORDON told him that he wanted ▓▓▓ o send a note to GORDON that he "bought the truck," which was code that he killed Trooper Graham. Additionally, the CW stated that GORDON requested that ▓▓▓ mail a newspaper article to verify the death.

71.    The CW stated that GORDON was "excited" that ▓▓▓ was finally going to kill Trooper Graham and the witness. The CW explained that GORDON told him that some of his charges were recently dismissed and that if both Trooper Graham and the other guy were gone his case would be gone too. The CW stated that GORDON did not want to speak on the phone because he was worried that someone may be cooperating with the police.

**Recorded Conversation Between GORDON And The Cooperating Witness**

72.     On April 14, 2015, at approximately 1:45 p.m., Trooper Collins and I had the CW
brought from Dorm 3 to the Health Services Unit. At the Health Service Unit, MSO Lieutenant
Karelas outfitted the CW with an electronic recording device and the CW was then brought back
to Dorm 3.

73.     On April 14, 2015, at approximately 2:30 p.m., Trooper Collins, MSO Lieutenant
Karelas, and I monitored and controlled a letter delivery to GORDON in Dorm 3. The letter was
drafted by Trooper Collins and me, acting in an undercover capacity, and posing as          the
fictitious cousin of the CW. The letter was written on the inside of a "Congratulations" greeting
card and read in its entirety: "Hello my friend second job is done do you want to wait a week to
buy truck? Will send proof when its in the news ok? You and [CW] call me soon talk about $
and truck God Bless." The purpose of this letter was to give GORDON the impression that
            was killed and that         was awaiting further instruction as to when GORDON
would like Trooper Graham killed. Trooper Collins, MSO Lieutenant Karelas, and I monitored
the delivery of the letter via the house of correction's surveillance/security cameras.

74.     On April 14, 2015, at approximately 2:36 p.m., I observed GORDON retrieve his mail, to
include the undercover Congratulations greeting card, from the Officer's Station. GORDON
immediately walked to the CW who was seated at a round table within Dorm 3. I observed
GORDON sit down at the table with the CW and pass the Congratulations greeting card to him.
I observed the CW and GORDON engage in conversation while playing card games. At
approximately 3:33 p.m., I observed the CW stand up and walk to the phone area of Dorm 3. At
the same time I received a call from the CW who informed me that he was finished with his
conversation with GORDON. I instructed CW to return to his bunk and wait for further

instruction from Trooper Collins and me.

## Interview of Gordon

75.      On April 14, 2015, at approximately 4:30 p.m., GORDON was brought to an interview room within the house of correction where Trooper Collins, MSO Lieutenant Karelas, and I were waiting. Upon his arrival at the interview room, I advised GORDON of his *Miranda* rights. I informed GORDON that he was under investigation for the solicitation to commit murder of both Trooper Andrew Graham and                    . GORDON responded that he knew both Trooper Graham and                    but he was "shocked" at what I was telling him. GORDON told us that he did not want to make a statement and the interview ended.

## Debrief of Cooperating Witness

76.      Trooper Collins, MSO Lieutenant Karelas, and I retrieved the electronic recording device from the CW. Prior to downloading and reviewing the recording I spoke with the CW about his conversation with GORDON. The CW told me that immediately after GORDON received the letter in the mail he brought the letter over to him. The CW further stated that GORDON told him that he wanted the cop killed and that the body not to be found. The CW went on to say GORDON told him that if the cop and the other guy                    were gone then his case will go away. The CW told me that GORDON said that he hoped that      burned the house or made it look like an accident. The CW said that after his conversation he walked to the phone and called me.

77.      Trooper Collins, MSO Lieutenant Karelas, and I downloaded and listened to the audio from the electronic recording device. It should be noted that while most of the conversation between the CW and GORDON can be understood, there is a considerable amount of background noise due to the environment where the recording took place. The following is a

synopsis of the conversation between the CW and GORDON. It is not a verbatim transcript but merely a summary.

78.     During their conversation GORDON is heard telling the CW that he has written and received correspondence from the CW's cousin. GORDON also discussed letters that he sent to CW via his secretary in an attempt to circumvent jail rules/regulations. Following the delivery of the greeting card, GORDON is heard telling CW that "the grey truck is the more important job." During their discussion about                      death, GORDON said "see if it comes out in the newspapers" and that he hoped that it appeared to be an accident. Additionally GORDON said "if they don't find the body in the truck, in the car, if they don't find his body there's no suspicion. He's gone." GORDON goes on to say 'I'd like to see the other truck die too." During this conversation GORDON explained to the CW that if there is not a body, then there is not a person who can testify against him. Later in their conversation the CW indicated that killing a cop would be more difficult because he would be carrying a firearm. GORDON responded by stating "unless he does it at the house...unless he follows him home." When CW asked GORDON if the cop is a state trooper GORDON replied, "He sent a picture. He knows who he is." Trooper Collins and I believe that GORDON is referring to the photograph that was previously sent to him by law enforcement authorities posing as                      where GORDON identified Trooper Graham as his intended target. GORDON is heard explaining to the CW that when the DA (District Attorney) calls the people to testify, they won't be there to testify. The CW told GORDON that he would call his cousin and that when they talk, they speak in "code." GORDON told the CW, "The less communication the better." GORDON is also heard explaining to the CW that he          would have to send proof via newspaper in order to get paid.

**Safeguarding of GORDON'S Personal Items**

79.     GORDON was not returned to Dorm 3 after the interview.  Rather, he was relocated to
another residential area of the Middlesex House of Correction.  His personal belongings in and
around his bunk, to include the contents of the draw he used to store personal items, items
located under his bed, and items located under his mattress were placed in plastic bags by law
enforcement personnel.  The only items belonging to GORDON that were not placed in plastic
bags, were items that were found already in a plastic bag under his bunk.  The plastic bags filled
by law enforcement personnel, as well as the plastic bag found among GORDON'S belongings,
were all moved to the secure office of Frank Bourgeois, Deputy Chief of the Sheriff's
Investigations Unit, located within the Security Division of the Middlesex House of Correction,
located at 269 Treble Cove Road, Billerica, Massachusetts.

## CONCLUSION

80.     Based on the forgoing, there is probable cause to believe that Andrew S. GORDON used
the mail and telephone, both a facility of interstate commerce, with the intent that a murder be
committed in violation of the laws of the Commonwealth of Massachusetts and as consideration
for the receipt of, and promise and agreement to pay, money and/or items of pecuniary value, in
violation of Title 18, United States Code, Section 1958(a).

81.     Based on my knowledge of the instant investigation, there is probable cause to believe
that Andrew S. GORDON had in his possession, or in and around his "bunk" items associated
with the planning and soliciting of a murder.  I know from my training and experience that
individuals who engage in criminal activity, such as the solicitation to commit a murder, often
keep items of evidentiary value on their person or in and around there personal space.  These
items may include hand written notes, stationary, notebooks, typed letters, photographs, greeting

cards, envelopes, stamps, mail, latex gloves, writing utensils, receipts and other documents and

items related to the offense of solicitation to commit a murder further described in **Attachment**

B.

BRIAN OPPEDISANO
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Subscribed and sworn to before me on this 15th day of April, 2015, at Boston, Massachusetts.

HON. JUDITH G. DEIN
United States Magistrate Judge

## Attachment A

## ITEMS TO BE SEARCHED

Four plastic bags containing the personal items of Andrew S. Gordon taken from in and around bunk #013 in dorm 3 of the Middlesex House of Correction, which are now located in the office of Frank Bourgeois, Deputy Chief of the Sheriff's Investigations Unit at the Middlesex House of Correction, the physical address of which is 269 Treble Cove Road, Billerica, Massachusetts 01862.

## Attachment B
## DESCRIPTION OF POTENTIAL PROPERTY TO BE SEIZED

Handwritten notes, stationary, notebooks, letters, photographs, greeting cards, envelopes, mail, latex gloves, writing utensils, identification documents, receipts, and other documents and items related to the offense of solicitation to commit murder.