UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
|  | ) Criminal No. 15-10117-PBS |
| v. | ) |
|  | ) |
| ANDREW GORDON | ) |
|  | ) |

**GOVERNMENT'S MOTION IN LIMINE TO ADMIT NON-PRIVILEGED INMATE
TELEPHONE RECORDINGS BETWEEN
THE DEFENDANT AND ATTORNEY GORDON GAINTY**

The United States respectfully asks the Court to admit non-privileged inmate telephone recordings between the defendant and Attorney Gordon Gainty, in which the defendant, while detained at the Billerica House of Corrections, sought Attorney Gainty's assistance to vet a hit man hired to carry out the murder of a Massachusetts State Trooper and another witness in a then-pending state case against the defendant.

## FACTUAL BACKGROUND

**1. PIN Registration and Monitoring of Prison Telephone Calls**

On October 13, 2014, Gordon completed and signed a telephone PIN application at the Billerica House of Corrections ("Billerica HOC") listing Attorney Gordon Gainty as a "friend," as opposed to an "attorney." (Exhibit A.) At the time, Gordon Gainty was representing Gordon in connection with divorce proceedings. The PIN application had a separate section for listing attorneys, which Gordon left blank. The application also contained the following acknowledgement: "Your acceptance of the PIN and use of the inmate telephones will be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including call monitoring, recording, three-way calling." Moreover, at the outset of all

recordings that are subject to monitoring and disclosure to law enforcement, there is a recorded warning that states the following:

> SECURIS MESSAGE:  Hello, this is a pre-paid collect call from Andrew Gordon, an inmate at the Middlesex County Billerica House of Corrections.  This call is subject to monitoring and recording.  You have the right to remain silence.  If you choose to speak beyond this point, anything you say may be furnished to state and/or federal prosecutors and may be used against you in a court of law.[1]

## I. Gordon's Due Diligence of the Fictitious Hit Man

In October 2014, Andrew Gordon was indicted on state charges for soliciting a hit man to kill or severely injure his estranged wife.  Gordon, who ran a financial firm called Gordon Analytics, had asked one of his clients for help in identifying a hit man.  That individual, Witness A, turned to the Chelmsford Police, who then arranged for a State Trooper to pose as the alleged hit man.  After Gordon's arrest, he was detained at the Billerica HOC pending trial.  Gordon's current federal case stems from allegations that while on pretrial detention at the Billerica HOC, he engaged in another murder-for-hire plot, this time, to solicit a purported MS-13 gang member to murder the State Trooper and Witness A.

In approximately December 2014, Gordon approached fellow inmate Ismael Silva and asked Silva if he knew anyone who would murder a State Trooper and another individual in exchange for compensation.  Silva, because he did not want to see a policeman get hurt, concocted a story about a fictitious cousin, Rico Silva, who might be willing to murder two individuals for compensation.  Silva also contacted law enforcement authorities, through his attorney, to alert them to the plot.

---

[1] It should be noted that pre-authorized calls between inmates and their attorneys are not subject to monitoring.  *See* Mass. Code. Regs 482.07 (2015) ("Telephone calls to pre-authorized attorney numbers … shall not be subject to telephone monitoring or recording.") (emphasis added).

As the murder-for-hire plot progressed, Gordon became concerned that he would be "set up" again and he endeavored to conduct due diligence on Rico Silva to ensure that he was in fact Ismael Silva's cousin, and—more importantly—that he was not working with law enforcement authorities. To this end, he contacted his divorce attorney, Gordon Gainty, by monitored prison telephone, and asked Gainty to research a P.O. Box number and a telephone number provided by Rico Silva, and to determine if the number belonged to the police. (Exhibit B at 5:15 to 7:00.) He told Gainty that the individual in question was the cousin of an inmate at the Billerica HOC, and that he might perform "snow removal" work for Gordon. Gainty, in turn, asked private investigator James Pero to research the telephone number and the P.O. Box.

During a March 14, 2015 monitored telephone call, Gordon directed Gainty to have the investigator try to determine whether the phone number belonged to the police. (Exhibit C at 4:25 to 4:42.)

>	GORDON: Ask him if there is any way to identify that as, you know, belonging to like the state police or someone else.
>
>	GAINTY: [PAUSE] I will ask him that.

Later that same day, in another monitored prison call, Gordon called Gainty back for an update on the investigation. (Exhibit D at 0:30 to 4:42.) On March 16, 2015, Gordon again called Gainty on a monitored prison call. (Exhibit D at 6:09 to 9:15; Exhibit C at 13:15 to 13:36.) Below is a draft transcription of a portion of that call:

>	GORDON: The key is that I want to make sure this is not a, umm, not a C-O-P, okay? That this is not someone trying to set me up. That's the most important thing ...
>
>	GAINTY: Yeah, okay.
>
>	GORDON: I sent you a list of questions, because this guy is referred by his cousin. Okay, umm, and I sent you list a questions that Jim can ask this guy. And the goal is to verify that he is not a

3

C-O-P because these are questions relating to his cousin that he should know. So I think if he can answer the questions, that means, you know, he probably isn't. Okay, that means he's the cousin and he is who he says he is, okay?

GAINTY: Okay, alright. Okay, I don't have those questions yet.

GORDON: You should have them in a day or two. Because it seems very suspicious. The fact that I had a relative call him up and he said, oh, he gave him the information and instructions and, you know, where to send the bill and he goes, I just want to talk to the person here. And I had someone talk to him in Spanish, and he's like no, I, I just want to talk to the actual person. And I get paranoid given my, ah, experience talking to strangers. And then this guy started sending me these letters from a P.O. Box in Manchester. And yet he has this untraceable line in Jaffrey or some other place. And we know he's Spanish. The person who answered the phone was Spanish. And it's weird. Because when we called up, the recording on his line, the dial tone was very different from any other phone we tried to call ... It's very unusual ...

GAINTY: And now it is a female's voice when you get the answering tape.

GORDON: So that's a little strange too. So he's probably using a throw-away phone, but the whole idea is that I just want to verify that he's not, you know, what I said. Okay? That this guy is legitimate. Because he's supposed to do some snow removal and landscaping – that's all I wanted to check out. Because it just seems a little odd—to put it lightly. I don't know what else you can do, but like I said, I sent you the questions. If he calls him up, he's going to have to get him on the phone. He can't like leave the questions on the phone, he's going to have to say, like listen, we just want to verify that you're not a C-O-P. Umm, and that's it. And say here are some questions we feel you should be able to answer.

GAINTY: Okay, okay. Alright, good, I will follow up with Jim on that.

GORDON (at 13:15): If Pero, again, the instructions are … we don't want to bug this guy. We don't want to shake him, but we want to find out ... If Pero can figure out ... does Pero have any idea of what would lead us to suspect if this guy is legitimate or whether he is an undercover cop? That's the goal.

4

      GAINTY:  Okay, yeah, I got it.  Take care.  Good bye.

Out of an abundance of caution, the Billerica HOC ceased monitoring the calls between Gordon and Gainty after consultation with the Middlesex County District Attorney's Office.  As set forth below, the communications between Gordon and Gainty are not privileged, and should be admitted at trial.

## ARGUMENT

The attorney-client privilege protects *only* those communications that are confidential and are made for the purpose of seeking or receiving legal advice.  *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003).  Moreover, the party who invokes the privilege bears the burden of establishing that it applies to the communications at issue and that it has not been waived.  *State of Maine v. United States Department of Interior*, 298 F.3d 60, 71 (1st Cir. 2002).

The calls between Gordon and Attorney Gainty are not privileged.  Gordon had no expectation of confidentiality in monitored prison calls.  He identified Gainty as a "friend" on his PIN registration form, and he was warned each time he called him that the call was being recorded and monitored and could be turned over to law enforcement.[2]  *See* Mass. Code. Regs. 482.09 ("Inmate acceptance of a PIN and use of inmate telephones shall be deemed as consent to the conditions and restrictions placed upon inmate telephone calls, including call monitoring [and] recording …").

---

[2] Indeed, since the calls were turned over in the government's automatic discovery, the defendant has not asserted privilege over them.

In *United States v. Hatcher,* the Eight Circuit held that:

> The presence of the prison recording device destroyed the attorney-client privilege. Because inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversation would remain private. The presence of the recording device was the functional equivalent of a third party.

323 F.3d 666, 674 (8th Cir. 2003); *see also United States v. Lentz*, 419 F. Supp. 2d 820, 827-828 (E.D. Va. 2005) ("[A]n inmate's telephone conversations with counsel are not protected by the attorney-client privilege where, as here, the inmate is notified at the outset that the calls are recorded and subject to monitoring."); *cf. United States v. Novak*, 531 F.3d 99, 102 (1st Cir. 2008) (holding that monitoring prison calls with an attorney did not violate the Fourth Amendment because the inmate consented to the monitoring, but not reaching the Sixth Amendment issue where prison calls with an attorney were *mistakenly* monitored and party against whom the recordings were being used did not hear the warning message); *United States v. Mitchell*, 11-CR-248, 2013 WL 3808152, *12-13 (E.D. Mich. July 22, 2013) (citing *Novak* in concluding that there was not Fourth Amendment violation, and further holding that where inmate is aware that calls are recorded, those calls are not protected by the attorney-client privilege).

Moreover, Gordon's solicitation of Gainty and Pero to research a potential hit man (and ensure that the hit man was not actually an undercover agent) was certainly not for the purpose of obtaining legal advice. Nor could the communications ever have been privileged because those communications were in the furtherance of an ongoing crime: a murder-for-hire plot. *See In re Grand Jury See Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1983) ("[C]ommunications that otherwise would be protected by the attorney-client privilege or the attorney work product are not protected if they relate to client communications in

6

furtherance of ongoing criminal of fraudulent activity."). In order for the crime fraud exception to apply, the attorney does not need to be aware of the client's criminal of fraudulent activity. *United States v. Gorski*, 807 F.3d 451, 462 (1st Cir. Dec. 9. 2015) ("[T]he crime fraud exception is triggered by the intent of the *client*.") (emphasis added).

## CONCLUSION

Accordingly, the government respectfully requests that the Court admit the telephone recordings between the defendant and Attorney Gordon Gainty.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:   */s/ Rachel Y. Hemani*
David G. Tobin
Rachel Y. Hemani
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Rachel Y. Hemani*
Rachel Y. Hemani
Assistant United States Attorney

Date: January 25, 2016