UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 15-10117-PBS |
| v. | ) | |
| | ) | |
| ANDREW S. GORDON | ) | |
| | ) | |

<u>GOVERNMENT'S TRIAL BRIEF</u>

 The United States of America, by its undersigned attorneys, respectfully submits this trial brief to assist the Court during the trial of the above-captioned matter, which is scheduled to commence on February 29, 2016.

I. <u>The United States Should be Allowed to Explain in its Opening that the Defendant was Incarcerated Because He Attempted to Hire Someone To Kill His Wife</u>

 This Honorable Court is now considering whether the United States will be allowed to mention in its opening statement and thereafter present evidence that the defendant was incarcerated at the Middlesex County House of Correction and Jail in Billerica, Massachusetts because he had attempted to hire a hitman to murder his wife.   The defense has argued that such evidence is unfairly prejudicial to the defendant.   The United States has filed a motion on this matter and this Trial Brief is presented to the Court, in part, to support the government's argument that such information should be allowed in the opening and in the government's case-in-chief.

 In the case now before the Court, the defendant is charged with attempting to hire someone to kill Trooper Andrew Graham, the officer who the defendant hired to kill his wife in the state case, and Frank Perlak, the man who essentially introduced the defendant to Trooper Graham in the state case.   As the evidence will make clear, the defendant's motive for hiring or attempting to hire someone to kill Trooper Graham and Frank Perlak was to guarantee that neither man would be a witness against him in his state case.

 The facts of the state case are inextricably interwoven with the facts of the federal case. But for the defendant's pending state trail for hiring someone to kill his wife, he would not have attempted to hire someone to kill the two main witnesses against him while he was incarcerated awaiting his state trial.

 The Honorable Court has suggested that the government could remove from its case any mention that the defendant was incarcerated for attempting to have his wife murdered and could instead inform the jury that he was incarcerated for trying to hire someone to beat his wife.   This

would be an untrue recitation of the facts.   It would require two government witnesses, Trooper Graham and Frank Perlak, to give incomplete, misleading and false testimony.   The defendant made it perfectly cleat to Frank Perlak and Trooper Graham that he wanted his wife to disappear and or be killed.   Moreover, if the defendant was charged with merely trying to have his wife beaten up, would he actually have set out to have a state trooper and another man murdered.   The answer is of course not.

There is no risk of unfair prejudice.   The cooperating witness [CW] in the case now before the court, will testify that the defendant approached him and asked if he knew anyone that would kill.   The defendant explained that he wanted to have his wife and a police officer killed.   The court has stated that the CW will be allowed to repeat what the defendant told him about wanting to have his wife killed.   Because the jurors properly will receive evidence that the defendant told the CW he wanted to have his wife killed, how could the defendant be unfairly prejudiced if the jurors are informed that his desire to have his wife killed is what got him incarcerated in the first place?

If the Court is concerned about the jury making unfair use of the evidence, the Court can give the jury a limiting instruction.

## SUMMARY OF FACTS

**The Defendant's Call to Frank Perlak**

On August 30, 2014, the defendant, the owner and operator of a financial services company, spoke over the telephone with his client, Frank Perlak, and asked Mr. Perlak if he knew anyone that could take care of a "nuisance problem" for him.   Mr. Perlak asked if it was an "animal nuisance" or a "human nuisance," to which the defendant responded "human."   Mr. Perlak asked, "you mean with a gun," and the defendant replied, "yes."   On the same day, Mr. Perlak reported the call to the local police.

On September 10, 2014, Mr. Perlak met with officers from the Chelmsford Police department and agreed to cooperate with their investigation into the defendant's plan to hire someone to commit murder.   On that day, with officers present, Mr. Perlak placed a call to the defendant.   Mr. Perlak asked the defendant if he had found someone to take of his problem.   The defendant replied that he had not and further stated that he was looking for a "bad person who does bad things."   The defendant said he wanted to have someone removed and confirmed that the problem was his wife.   The defendant also stated that he did not want to meet the person who does it and that he did not want any "traceability" and that he was happy to pay.

On September 12, 2014, Mr. Perlak again spoke over the telephone with the defendant with officers present.   Mr. Perlak told the defendant that he knew a guy who had just gotten out of prison, who could use the money, and who could help with the defendant's problem.   The defendant said that he wanted his problem to disappear; and Mr. Perlak asked the defendant if he meant "jimmy Hoffa disappear."   The defendant responded that it would depend on what the guy would do.   The defendant also stated that he did not want any more call on his cell phone because

the calls would be "traceable" and wanted Mr. Perlak to call him on his office phone.   Mr. Perlak gave the defendant a phone number, which he told the defendant was the number for the man, who could help with the defendant's problem.   The number was a number given to Mr. Perlak by the police.

Later on the same day, September 12, 2014, Massachusetts State Police Trooper Andrew Graham, an investigator assigned to the Middlesex County District Attorney' Office and who was participating in the investigation, received a call from the defendant on an undercover phone, the number of which had been given to the defendant by Mr. Perlak.   Trooper Graham did not answer the call and the defendant left the following message: "Ah yes, I am a friend of Frank's.   I was calling to see if you could help me out with a situation…"

**The Defendant and Trooper Graham Speak Over the Telephone**

Later on the same day, September 12, 2014, the defendant placed another call to the undercover phone.   Trooper Graham answered the call and spoke with the defendant.   The defendant stated that he heard that the man with whom he was speaking could take care of a situation for him and that he "needed someone close to taken care of."   Trooper graham asked for clarification and the defendant asked, "[h]ow far are you willing to go?"   Trooper graham responded, "[a]s far as it takes for the right price… you want me to go all the way?"   The defendant responded, [y]es, I want it to look like an accident during the day."   Trooper Graham asked, "[s]o you want me to kill someone?"   The defendant responded, "[w]hatever you think… what is your price?"   Trooper Graham told the defendant "$20,000" and that he needed $1,000 up front.   The defendant would not disclose the target over the telephone and agreed to text Trooper Graham a photo and address of the target.

Shortly after speaking with Trooper Graham over the telephone, the defendant called Mr. Perlak, got voice mail, and left the following message:   "Ah greetings, I spoke to the contact and he wanted to meet.   I really do not want to meet him directly.   It's gotta be a go between.   I can send him the information, but again it has to be a go between."

On September 15, 2014, after receiving permission from Mr. Perlak, the police opened an envelope that had been mailed to Mr. Perlak from the defendant.   The typed letter inside the envelope contained the defendant's wife's name, the name of her employer, her work address, her home address, her license plate number and the make of her car. The envelope also contained a biography of the defendant's wife, including her photo, from her employer's website.

On September 16, 2014, Mr. Perlak called the defendant and confirmed that he wanted Mr. Perlak to deliver the letter to the hit man.   The defendant instructed Mr. Perlak to destroy the outside envelope so it could not be "traced" to the defendant.   This call was conducted in the presence of the police.

On September 17, 2014, Mr. Perlak and the defendant spoke again over the telephone with the police present.   The two agreed to meet on Friday, September 19, 2014, at Sal's Pizza in Chelmsford, at which time the defendant was to give Mr. Perlak money to give to the hit man.

Prior to the planned meeting on September 19, 2014, Mr. Perlak had to be hospitalized and could not go to the meeting.   Trooper Graham ultimately met the defendant at Sal's Pizza.

**The Defendant and Trooper Graham meet at Sal's Pizza**

Trooper Graham observed the defendant arrive at Sal's Pizza, approached the defendant, and told the defendant that Frank could not make the meeting and sent him.   Trooper Graham and the defendant sat at a table outside the restaurant.   Once seated, Trooper Graham told the defendant that he would be dealing with him directly, that that he was a friend of Frank's, and that he would make the defendant's "problem go away."   When the defendant asked if he was the man the defendant poke with, Trooper Graham responded that he was the man.

Trooper Graham asked the defendant if he had the money ($1,000) and the defendant said yes.   Trooper Graham asked "you still want me to kill your wife?"   The defendant answered, "[y]es, but I'm concerned about traceability."   The defendant was concerned about being linked to the murder through phone records and that the killing of his wife might lead police to him.   He said he had another idea and decided he wanted Trooper Graham to beat up his wife instead.   He wanted it done before a probate court appearance on September 29, 2014.

At one point during the meeting, Trooper Graham walked away to give the defendant the opportunity to make a call to check on Frank Perlak to confirm Perlak was in the hospital. Trooper Graham walked over to his grey Ford truck and at one point noted that the defendant appeared to take a photo of the truck. The defendant did not want to pay $20,000 to have his wife beaten up and negotiated the price down to $2,000.   The defendant said he would Trooper Graham the money after he spoke with Frank.

The defendant was charged in a thirty-three count Indictment in Middlesex Superior Court with, among other offenses, Witness Intimidation, Stalking, Criminal Harassment, Malicious Destruction of Property and Solicitation of a Felony (solicitation to commit murder).   The defendant was detained at the Middlesex County House of Correction and Jail in Billerica, Massachusetts awaiting trial from October 2014 until he pleaded guilty on May 27, 2015.   After he was sentenced, the defendant was transferred to the Massachusetts Department of Correction to serve his sentence.

**Cooperating Witness**

On December 17, 2014, Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent Brian Oppedisano was notified that the Massachusetts State Police [MSP] assigned to the Middlesex County District Attorney's Office received a letter that was written by an inmate [herein referred to as CW] at the Middlesex County House of Correction.   The letter was sent by

the CW to his attorney, who gave it to the MSP.   In summary, the CW wrote that a fellow inmate approached the CW for help in a murder for hire plot.   The letter indicated that the intended target was a state police detective (later identified to be Trooper Andrew Graham).

The CW is charged in the Middlesex Superior Court with aggravated rape and assault with a dangerous weapon (knife).   He has previous convictions for assault with a dangerous weapon and assault and battery.

## First Interview of Cooperating Witness

On December 17, 2014, MSP Trooper Gerald Collins, MSP Lieutenant Paul Bulman, and Bureau of Alcohol, Tobacco, Firearms and explosives Special Agent Brian Oppedisano interviewed the CW at the Middlesex County House of Correction.   The CW confirmed that he wrote the letter to his attorney and did so because he did not want a policeman to get hurt or killed. The CW told the law enforcement officers that he is currently housed in Dorm 3 with fellow inmate Andrew GORDON.   He positively identified the defendant from a photograph shown to him, as the man who talked with him about hiring a hit man.

The CW said that he and the defendant had a friendly relationship and that they were both living in Dorm 3.   The CW recounted a conversation that he and the defendant had in December, 2014.   The CW explained that the defendant asked the CW if he knew anyone who "had the balls to kill."   The defendant said that he would pay someone to kill the police officer involved in his case and his wife.

The CW told the law enforcement officers that he told the defendant that he had a cousin on the outside, an MS-13 gang member, who was "on the run," and who would be interested in taking the contract for the murder.   The defendant told the CW how angered he was for being set up by the MSP.   The CW told the law enforcement officers that he fabricated the story about his cousin in an attempt to prevent the defendant from asking other inmates to commit the murder.

## Second Interview of Cooperating Witness

On December 22, 2014, MSP Trooper Collins, MSP Lieutenant Bulman, and Special Agent Oppedisano interviewed the CW at the Middlesex County House of Correction for a second time.   The CW agreed to accept a letter or note through the mail sent by a law enforcement officer posing as the CW's "hitman" cousin "Rico Silva."   Further, the CW agreed to show the letter or note to the defendant.

At some point after the above-described meeting, the CW received a Christmas Card from "Rico Silva," which contained a Post Office Box address in New Hampshire supposedly belonging to "Rico Silva."   As planned with law enforcement, the CW showed the Christmas card to the defendant.   Shortly thereafter, the defendant gave the CW a note containing the following information:

Trooper Andrew Graham
Middlesex District Attorney
State Police Detective Unit

Silver Ford F-150 Truck
5'10"
165 lbs
Brown hair.

The defendant wanted the CW to mail the information to his cousin "Rico Silva."

**The Defendant Talks with CW After Meeting with his Attorney**

At some point thereafter, the defendant met with attorney and then approached the CW in Dorm 3.   The defendant informed the CW that his attorney told him that Trooper Graham was not the only critical witness against him, but that there was a cooperating witness that could be called to testify against him.   The defendant stated that he wanted that witness killed in addition to Trooper Graham.   The defendant described the witness he wanted killed as in his 60's, and that he lived in Lowell with his wife and that he had a gun collection.

During the conversation the defendant stated that he wanted the CW to handle any communications with the CW's cousin because he (the defendant) could not be involved.   The defendant stated that he did not want to write any letters because his handwriting and or fingerprints could link him to the plot.

Within hours of the conversation, the defendant gave the CW an envelope with a note inside containing information about the Trooper and the witness he wanted killed.   The note read:

Frank Perlak Sr
Age 65
Tyngsborough, MA
Married
Gun Collection
Works at Axis Technologies Lowell MA

Trooper Andrew Graham
Middlesex District Attorney
State Police Detective Unit

In the left margin next to Mr. Perlak's information the following was written:

"Has to be an accident like a house fire."

In the left margin next to Trooper Graham's information the following was written:

"Line of duty."

That note was later tested for fingerprints and the defendant's fingerprint was found on the note.

At some point thereafter, the defendant gave the CW another note that he wanted the CW to send to his "cousin" "Rico Silva."   The defendant told the CW that he left the note inside the CW's bible, which the CW kept at his bunk.   The CW checked his bible and found a note very similar to the most recent note the CW had received from the defendant.   This new note contained the names and other information about Trooper Graham and Mr. Perlak.   This note also had suggestions on how the killings of both men should be staged.   Next to the information about Mr. Perlak, the note read "has to be an accident like a house fire."   Next to the information about Trooper Graham, the note read "line of Duty."

On January 30, 2015, Trooper Collins and Special Agent Oppedisano met again with the CW at the Middlesex County House of Correction.   The CW provided Trooper Collins and Special Agent Oppedisano with the date and time that the defendant gave him the note.   Based on the date and time provided to them by the CW, Trooper Collins and Special Agent Oppedisano reviewed surveillance video of Dorm 3 for Friday, January 16, 2015, between 9:00 p.m. and 10:30 p.m.   The video showed the defendant standing at his bunk writing on paper.   The defendant was wearing blue-colored latex gloves while writing on the paper.   The video showed the defendant fold the paper, walk over to the CW's bunk, and appear to bend over and leave the paper there. The video goes on to show the CW walk to his bunk and retrieve what the defendant had left there.

On February 6, 2015, Trooper Collins and Special Agent Oppedisano met with the CW at the Middlesex House of Correction.   The CW informed them that the defendant had been moved from Dorm 3 to Dorm 4 due to an altercation.   Trooper Collins and Special Agent Oppedisano received confirmation from House of Correction authorities that the defendant was moved on February 2, 2015, due to an altercation with another inmate.

Since the CW and the defendant were now in separate dorms at the Middlesex House of Correction, Trooper Collins and Special Agent Oppedisano decided to contact the defendant in writing, in an undercover capacity, posing as "Rico Silva," the fictitious cousin of the CW.   The CW told Trooper Collins and Special Agent Oppedisano that the defendant had routinely asked him on numerous occasions about his cousin and when he was going to kill Trooper Graham and Mr. Perlak.

On February 10, 2015, Trooper Collins and Special Agent Oppedisano drafted a letter to the defendant from "Rico Silva."   The letter was written on the inside of a Valentine's Day greeting card.   The letter was drafted in a "coded" fashion.   The letter read that "Rico" knew that he (the defendant) has a "problem" and that "Rico" needs "work" and gets paid to "remove snow." The letter also questioned the defendant about where to send the "bill."   The letter provided the defendant with the address of an undercover Post Office Box in Manchester, New Hampshire.

The defendant was instructed in the letter that if he mailed something to "Rico" to include only the address and omit the name.

On February 25, 2015, Special Agent John Forte of the ATF Manchester New Hampshire Office retrieved a letter from the previously established undercover Post Office Box.   On that same date, Special Agent Forte transferred the unopened letter to Special Agent Oppedisano.   The envelope was addressed to the Post Office Box without an addressee name and without a return address or return name.   The inside of the envelope contained a hand written letter on white lined paper.   The letter read:

"TAKE CARE OF WORK."   The letter was written in block style letters and in a generic fashion, so as to mask the writer's handwriting.   The letter was postmarked by the United States Postal Service with the date of "18 FEB 2015."

**Video Surveillance of the Defendant**

On February 25, 2015, Trooper Collins and Special Agent Oppedisano, along with MSO Lieutenant George Karelas, reviewed video footage of Dorm 4 at the Middlesex House of Correction in Billerica, Massachusetts.   Investigators viewed footage from February 12, 2015 through February 18, 2015 in an attempt to determine when the defendant received the undercover Valentine's Day greeting card.   The following is a summary of video footage from February 17, 2015 from approximately 2:39 p.m. through 3:15 p.m.:

The defendant (and other inmates) received their incoming mail in the area of the Officer's Station.   The defendant opened and read a piece of mail while standing in front of the Officer's Station.   The defendant walked to his bunk holding a pink-colored card that he received in the mail.   The defendant sat on his bunk and put on blue latex gloves.   The defendant wrote on a white pad of paper and retrieved an envelope from under his mattress.   The defendant reviewed the pink colored card on several occasions while seated at his bunk.   The defendant placed a folded piece of paper in an envelope and walked to a water cooler.   The defendant walked to the outgoing mailbox and walked back to his bunk without the envelope.   The defendant then took off his blue latex gloves.

After the defendant was moved from Dorm 3 to Dorm 4 and separated from the CW he attempted to contact the CW through written correspondence on several occasions.   It is against the Middlesex County House of Correction policy for an inmate to contact another inmate from a different unit via the mail.   The letters were seized by the MSO and transferred to Trooper Collins and Special Agent Oppedisano.   On February 25, 2015, MSO Lieutenant Karelas intercepted an outgoing letter addressed to Andrew Gordon at the Middlesex House of Correction in Billerica, Massachusetts.   The return name and address on the letter belonged to the CW.   The handwriting on the envelope was not the CW's, but was consistent with GORDON's known handwriting. Investigators believe that the letter was in fact from GORDON and intended for the CW.   As noted previously, inmates are not allowed to communicate with inmates in other dorms within the Middlesex House of Correction.   One way around that prohibition is to place a letter in the house

8

of correction mailbox using the return address of the inmate with whom you wish to communicate and placing a non-deliverable address on addressee portion of the envelope.   When it is determined that the letter cannot be delivered it will be returned to the inmate indicated on the return address section of the envelope.     In summary, GORDON asked the CW to let him know if he (CW) gets the letter and instructed CW how to address a letter to send back to him (GORDON) to prevent the jail from intercepting it.   In his letter, GORDON goes on to ask the following:

"How is your cousin?"
"How is his work?"
"I hope he is successful."
"I am confident his clients will pay him based on his efforts."

On February 25, 2015, MSO Lieutenant Karelas intercepted a second outgoing piece of mail. The letter was addressed to:

"Anders Gundersson
P.O. Box 980
Newton, MA 02165"

The return name on the envelope was CW's name along with a return address of the Middlesex House of Correction in Billerica, Massachusetts.   Investigators immediately recognized that the handwriting was not the CW's and that the handwriting was consistent with GORDON's.

Special Agent Oppedisano contacted Special Agent Robert Parker of the United States Postal Service/Office of Inspector General in an attempt to determine if the above mentioned Post Office Box existed.   Special Agent Parker advised that no such Post Office Box existed with the name of Anders Gundersson from Newton, Massachusetts.   A search through the Massachusetts Registry of Motor Vehicles computerized databases revealed that there was not a Anders Gundersson who had a MA identification card or MA driver's license.   Additionally, a search of publicly available computer databases revealed no match for Anders Gundersson in the Commonwealth of Massachusetts.   Inside of this envelope was a handwritten note on white lined paper.   Trooper Collins and Special Agent Oppedisano determined that this letter was an attempt by the defendant to contact CW.   In the letter the defendant asked how things were going and how is your family.   The defendant wrote that he heard that a cousin moved to New Hampshire and asked about his job prospects.

On February 27, 2015, Trooper Collins and Special Agent Oppedisano drafted a second letter to the defendant from "Rico Silva," the fictitious cousin of CW.   The letter was written on the inside of a "Congratulations" greeting card.   The letter was written in a "coded" manner and indicated that the defendant's letter had been received and that they were ready to do "work."   The letter included a bill and told the defendant it was for a down payment.   The letter asked the defendant which "job" he wanted done first and which "snow" (person) is he more worried about.   The letter was mailed on February 27, 2015, at the United States Post Office located at 51 South Broadway, Salem, New Hampshire 03079.

**Second Letter to New Hampshire Post Office Box**

On March 3, 2015, MSO Lieutenant Karelas informed Trooper Collins and Special Agent Oppedisano that an outgoing letter addressed to the undercover Post Office Box in Manchester, New Hampshire had been intercepted.   The envelope had no return address, no return name and no addressee name.   Inside of the envelope was a handwritten letter on white lined paper.   The writing was written in block style letters and in a generic manner, so as to mask the writer's handwriting.   The letter read in full:

"TAKE CARE
OF BOTH SNOW JOBS
SOON.   NO TIME TO LOSE
INVOICE FOR
SNOW REMOVAL
OF DRIVEWAY
AND ROOF
PAY AFTER COMPLETION
OF AT LEAST ONE
SEND PROOF
[nick name of CW]CAN VOUCH"

**Video Surveillance of the Defendant**

On March 3, 2015, Trooper Collins, MSO Lieutenant Karelas, and Special Agent Oppedisano reviewed video footage of Dorm 4 from February 28, 2015 through March 2, 2015, in an attempt to determine when the defendant received the undercover "Congratulations" greeting card.   The following is a summary of video footage of Dorm 4 from March 2, 2015, from approximately 2:22 p.m. through 2:50 p.m.:

The defendant (and other inmates) received incoming mail in the area of the Officer's Station. The defendant opened and read a piece of mail (pink colored card) while standing in the area around the Officer's Station.   The defendant walked to his bunk holding the pink-colored card that he received in the mail.   The defendant left the pink colored card on top of an adjacent bunk. The defendant walked to the Officer's Station, retrieved blue colored latex gloves from on top of the desk and walked back to his bunk.   The defendant put on the gloves and retrieved a white colored pad of paper from underneath his mattress and an unknown item from his drawer.   The defendant wrote on the white pad of paper and retrieved an envelope from under his mattress. The defendant reviewed the pink colored card on a several occasions.   The defendant walked to the sink area with a napkin or paper towel and returned to his bunk.   Upon his return to his bunk it appeared that the defendant moistened and sealed the envelope and affixed a stamp.   The defendant walked to the outgoing mailbox and walked back to his bunk without the envelope. The defendant took off his blue latex gloves.

**Third Letter to New Hampshire Post Office Box**

On March 9, 2015, MSO Lieutenant Karelas informed Trooper Collins and Special Agent Oppedisano that an outgoing letter addressed to the undercover Post Office Box in Manchester, New Hampshire had been intercepted.   The envelope had no return address, no return name, and no addressee name.   Inside of the envelope was a handwritten letter on white lined paper.   The writing was written in block style letters and in a generic manner, so as to mask the writer's handwriting.   The letter read in full:

"CABBAGE FOR YOU
FROM THE FARM
MORE SNOW JOBS
AVAILABLE. GRAY FORD
AND THE OTHER SNOW
MAY GET ME TO THE
FARM. PLOW VERY SOON."

**"Rico Silva's" Third Letter to the Defendant**

On March 11, 2015, Trooper Collins, MSO Lieutenant Karelas and Special Agent Oppedisano controlled and monitored a letter delivery to the defendant in Dorm 4.   The letter was drafted and written by Trooper Collins and Special Agent Oppedisano posing as "Rico Silva," the fictitious cousin of the CW.   The letter was written inside of a Saint Patrick's Day greeting card, which also contained a color photograph of Trooper Andrew Graham and a second trooper unrelated to the current investigation.   Both troopers were standing next to a gray Ford F150 pickup truck.   A question mark was written above each of the two troopers in an effort to have the defendant identify Trooper Graham as his intended target.   Inside of the greeting card was a PIN number (051986) and a phone number (603-593-3445) for the defendant to contact "Rico" to discuss the "bill" and details of the murder for hire plot.   The PIN number allows inmates to have access to make outgoing phone calls from within the jail.   ATF Special Agent Richard Zayas, acting in an undercover capacity posing as "Rico Silva," was briefed on the investigation and was prepared to receive a phone call from the defendant.

**Video Surveillance of the Defendant**

On March 11, 2015, Investigators monitored the defendant in real-time via house of correction surveillance/security cameras.   The following is a summary timeline (times are approximates):

2:59 p.m.: The defendant received his incoming mail from an officer at the Officer's Station within Dorm 4 and walked to the couch area.   The defendant opened the undercover greeting card and picture.

11

3:06 p.m.: The defendant walked to his bunk, picked up a pad of paper, and put on his blue HOC jumpsuit.

3:12 p.m.: The defendant left his belongings at his bunk and departed Dorm 4 to the interview rooms for an attorney visit.

4:17 p.m.: The defendant departed from the interview room and returned to Dorm 4.   Upon his arrival at Dorm 4, the defendant sat down and ate his dinner.

4:31 p.m.: The defendant retrieved blue latex gloves from his mattress area, put the gloves on, and looked at the undercover greeting card and photograph while at his bunk.

4:33 p.m.: The defendant appeared to be writing on a white pad of paper that he retrieved from underneath his mattress.   The defendant appeared to reference the photograph that was sent to him.   The defendant placed a piece of paper into the envelope and moistened and sealed the envelope.   The defendant then placed the envelope in the outgoing mailbox.

4:42 p.m.: The defendant walked from his bunk, holding the undercover greeting card, to a phone next to the couch area.

4:54 p.m.: The defendant walked from the phone back to his bunk.   The defendant appeared to be looking at one of the previously delivered undercover greeting cards.

5:00 p.m.:   The defendant appeared to be looking at the undercover greeting card and writing on white pad of paper.

5:12 p.m.: The defendant walked from his bunk with a second white envelope and placed it in the outgoing mail box.

5:13 p.m.: The defendant walked back to his bunk and took of his blue latex gloves

**The Defendant Attempts to Call "Rico Silva"**

On March 11, 2015, between 7:04 p.m. and 7:54 p.m., the defendant, who utilized the provided PIN (051986), attempted to call Special Agent Zayas, who was acting in an undercover capacity and posing as "Rico Silva," at the provided undercover phone number (603-593-3445). Due to a technical problem with the undercover phone line, the calls were not completed.

On March 11 at 8:05 p.m., Special Agent Zayas received an incoming call from 857-888-4834.   This call could not be completed.   Investigators determined that GORDON asked a fellow inmate (PIN assigned to Jonathon McNeil) who was already talking on a phone in Dorm 4 to make a 3-way call to the undercover phone number.   GORDON can be heard in the background of McNeil's recorded phone call asking McNeil to make the call.

**The Defendant Calls Charles Leavitt, Defendant's Deceased Mother's Boyfriend**

On March 11, 2015, at 9:37 p.m., the defendant placed an outgoing call to Charles Leavitt. The call was recorded by the house of correction per standard procedure.   The defendant asked Mr. Leavitt to call a snow removal company at 603-593-3445 (the undercover phone number) and relay a message. Specifically, the defendant asked Mr. Leavitt to tell the person who answered the call that his cousin from Billerica recommended him, that the snow removal needs to be done soon, that payment is not possible until the end of the first job and to send proof that the first job is done.

On March 12, 2015, at approximately 4:18 PM, Special Agent Zayas received an incoming call on his undercover phone from (508) XXX-XXXX.   Special Agent Zayas missed the call and no voice mail was left by the caller.   Special Agent Zayas was able to use a feature on his phone to determine the caller's phone number.   On the same date, at approximately 5:42 p.m., Special Agent Zayas contacted the caller [Charles Leavitt].   Special Agent Zayas advised Mr. Leavitt that someone had previously attempted to contact him from this telephone number.   Mr. Leavitt asked Special Agent Zayas if he was the "snow removal man."   Special Agent Zayas replied in the affirmative.   Mr. Leavitt provided Special Agent Zayas an address, 4 Dennison, and stated to Special Agent Zayas that he needed to remove the snow.   Mr. Leavitt further stated that once the snow was removed he could send a bill.   Special Agent Zayas asked Mr. Leavitt male if he was going to talk to "him."   Mr. Leavitt responded in the affirmative.   Special Agent Zayas requested that the next time Mr. Leavitt spoke with "him" via telephone that he tell "him" that he (Special Agent Zayas/ Rico Silva) needed to speak with him.   Mr. Leavitt replied that he would advise "him."   This conversation was recorded.

On March 13, 2015, at approximately 5:57 p.m., the defendant made an outgoing phone call to Mr. Leavitt.   Mr. Leavitt advised the defendant that he had already spoken with the "snow removal guy."   Mr. Leavitt told the defendant that the guy wanted to speak with him directly. The defendant responded by telling Mr. Leavitt "call him back and tell him it's a recorded line" and it's "not a good idea to talk to him directly."   The defendant went on to instruct Mr. Leavitt to tell him that "he wants the work done" and to "finish the first job and then he'll get paid."   The defendant also instructed Mr. Leavitt to tell him that "there are two jobs, the driveway and the roof" and that he "needs the first job done before he gets paid."   The defendant reiterated to Mr. Leavitt to tell him that "it's a recorded line" and "we don't feel safe talking on the phone."

**Unknown Hispanic Male Calls "Rico Silva"/Special Agent Zayas for the Defendant**

On March 12, 2015, at approximately 5:57 p.m., Special Agent Zayas received an incoming call on the undercover phone (603-593-3445) from 866-718-4777.   This number is associated with Securus, a telecommunications company that is contracted with the Middlesex House of Correction for inmate telephone services.   An unknown Hispanic male engaged Special Agent Zayas in conversation inquiring if he was from a landscaping company.   Special Agent Zayas requested to speak with the defendant, to which the Hispanic male replied that the defendant was busy.   The Hispanic male told Special Agent Zayas that he (the defendant) tried to call him on

numerous occasions and that he had questions for him.   The Hispanic male told Special Agent Zayas that the defendant would call him later to talk.

**Fourth and Fifth Letters to New Hampshire Post Office Box**

On March 12, 2015, Special Agent Oppedisano was informed by MSO Lieutenant Karelas that two outgoing letters addressed to the undercover Post Office Box in Manchester, New Hampshire had been intercepted.   The envelopes had no return address, no return name, and no addressee name.

Inside of the first envelope was the same color photograph that had been sent to the defendant on March 11, 2015, with question marks over Trooper Graham and over a second trooper.   The photo now had a check over Trooper Graham.

Inside of the second envelope was a handwritten letter on white lined paper.   The writing was written in block style letters and in a generic manner, so as to mask the writer's handwriting.  The letter read in full:

YOU FOUND IT
NO CALLS
GOOD LUCK
SEND PROOF OF
SNOW REMOVAL

**The Defendant's Letter to the Cooperating Witness**

On the same date, another outgoing letter was intercepted by Investigators.   The letter had a return address for the CW and was addressed to "Andre Garcia, 15 Elm Street, Lowell, MA 01852."   The letter contained inside appeared to be written by the defendant to the CW.   In this letter, the defendant asked the CW about the undercover PIN and phone number and asked CW to "please make sure the snow is removed."

**Sixth Letter to New Hampshire Post Office Box**

On March 13, 2015, Deputy Chief Frank Bourgeois of the Middlesex County House of Correction intercepted an outgoing letter addressed to the undercover Post Office Box in Manchester, NH.   The envelope had no return address, no return name, and no addressee name. Inside of the envelope was a hand written letter on white lined paper.   The letter referred to having snow removed and asked how much for the first job and second job.   The letter went on to read that payment would be made after the completion of the first job and please work soon.   The letter ended with "whose PIN #?"

**Seventh and Eighth Letters to the New Hampshire Post Office Box**

On March 16, 2015, Lieutenant Karelas informed Trooper Collins and Special Agent Oppedisano of two outgoing letters addressed to the undercover Post Office Box in Manchester, New Hampshire. The envelopes had no return address, no return names, and no addressee names. Inside of the first envelope was a handwritten letter on white lined paper. In summary, the letter stated that there may be a misunderstanding and that a driveway and roof need to be cleared of snow. The letter went on to read that there are concerns for flooding and ice dams and that a bobcat or earthmover would be needed.

Inside of the second envelope was a handwritten letter on white lined paper. The writing was written in block style letters and in a generic manner, so as to mask the writer's handwriting. The letter read in full:

"SNOW IS MELTING
SEVERAL PLOWS
LOOKING FOR WORK
CALLS ARE RECORDED
SEND PROOF OF FIRST JOB
PAYMENT FROM OUTSIDE
GOOD LUCK"

**Interview of the Cooperating Witness**

On March 17, 2015, Trooper Collins, MSO Lieutenant Karelas and Special Agent Oppedisano interviewed the CW, who informed them that he had received numerous written messages from the defendant while the defendant was living in a different dorm. The CW stated that he began to receive the notes approximately three weeks previously. The CW explained that inmates from Dorm 3 and Dorm 4 have visitation at the same time and that when inmates are at visitation, the messages were passed from a Dorm 4 inmate to a Dorm 3 inmate and then brought back to Dorm 3 for delivery to the CW. The CW went on to say that inmates are routinely searched after visitation, but a small piece of paper would often not be recovered or found by house of correction staff.

**The Defendant's Notes to Cooperating Witness**

The CW provided them with eight handwritten notes that were delivered to him by various inmates from Dorm 3. The CW explained that when the Dorm 3 inmates returned from their visits the notes were given to the CW. The CW identified the writing to be the defendant's and noted that the defendant addressed the notes with improper spelling of the CW's name. The CW put the notes in chronological order to the best of his recollection and dated several of them upon receipt. In summary, the notes were about CW's cousin from New Hampshire, snow removal, and inquiring if the work has been completed.

15

One note dated "03-08" (March 8, 2015) by the CW after he received it was written on white lined paper.   The note was written in block style letters and is consistent with previously written letters by GORDON that were addressed to the undercover Post Office Box.   The note read:

"SNOW REMOVAL
HAS TO BE DONE
VERY SOON CABBAGE
WHEN OUT TO THE FARM"

A note dated "Fri 13" (March 13, 2015) by the CW contained the following message:

"Is this your PIN 051986
Do you know 603-593-3445"

The eight notes were examined for fingerprints and one of the notes contained the defendant's fingerprint.

**Cooperating Witness's Note to GORDON**

Under the direction and control of Trooper Collins and Special Agent Oppedisano, the CW drafted the following note to GORDON:

que pasa diablo the pin is good
and that's my cuz is number
my cuz is nervous about calls
from strangers

The note was addressed to "diablo cabron"

The CW was instructed to have the note delivered to the defendant in the same manner as the defendant was able to deliver notes to the CW.

**Private Investigator James Pero Calls "Rico Silva" / Special Agent Zayas on Behalf of the Defendant**

On March 20 and 21, 2015, Special Agent Zayas received incoming calls from 508-294-6932.   The unknown caller identified himself as "Jim" and asked SA Zayas if he was involved with "snow removal."   Special Agent Zayas told "Jim" that he needed some money and that he needed to speak with the defendant.   The investigation revealed that James Pero was contacted by the defendant's divorce attorney and asked to contact "Rico Silva" and investigate him.

16

**The Defendant's Letter to Gina Georgoudis**

On March 20, 2015, MSO Lieutenant Karelas notified Trooper Collins and Special Agent Oppedisano of an outgoing letter sent by the defendant addressed to Gina Georgoudis. Lieutenant Karelas photocopied the contents and the original letter was allowed to continue on through the normal mail process.   The envelope contained two letters, both written on white lined paper.

The first letter was written to "Gina."   In summary, the letter asked Gina to send the second attached letter to a fellow inmate in the Billerica Jail.   The defendant wrote that he could not send a letter directly to another inmate, but it was okay if Gina sent the attached letter from outside of the jail.   In his letter to Gina, the defendant provided the CW's name and the address of the house of correction for the attached letter to be sent.

The second letter, the one Gina was instructed to mail to the CW, asked the CW how he and his family were doing.   The defendant wrote that he missed Dorm 3 and that Dorm 4 is quieter and that the Correctional Officers are better.   The defendant asked the CW if his cousin had moved to Manchester, New Hampshire and asked the CW to confirm his cousin's mailing address and phone number.   The defendant further wrote that he is reluctant to talk on the phone and to please send a letter back through Gina.

**Ninth Letter to the New Hampshire Post Office Box**

On March 26, 2015, Special Agent Oppedisano was notified by Lieutenant Karelas of an outgoing letter believed to be from the defendant to the undercover Post Office Box.   The letter was post marked "28 MAR 2015" by the United States Postal Service.   The letter read in its entirety:

HOW IS THE SNOW PLOW AND LANDSCAPING BUSINESS?
HAVE YOU BEEN BUSY?
HOW IS [CW's nick name]?
WE CALLED TO CHECK ON REFERENCES, ETC.
SNOW REMOVAL JOB- ROOF DRIVEWAY
LANDSCAPING- LAWN, CLIPPINGS
PAYMENT AFTER FIRST JOB, OR EXIT.
SEND PROOF OF COMPLETION OF THE FIRST JOB
LORD BLESS

On or about April 1, 2015, MSO Lieutenant Karelas informed Trooper Collins and Special Agent Oppedisano that the defendant had requested to be moved from Dorm 4 back to Dorm 3.

17

On April 6, 2015, at approximately 2:53 p.m., the Middlesex Sheriff's Office transferred the defendant to Dorm 3.   Lieutenant Karelas and Special Agent Oppedisano monitored the defendant via the jail's video security cameras during the transfer.   Upon the defendant's arrival at Dorm 3, he and the CW immediately engaged in conversation.   Both the CW and the defendant can be observed sitting at a table together and they appeared to be viewing and examining the greeting cards and letters that were previously sent to both the defendant and the CW.

**Telephone Call to "Rico Silva" / Special Agent Zayas**

On April 6, 2015, at approximately 3:30 p.m., Lieutenant Karelas and Special Agent Oppedisano monitored and recorded a telephone call from the CW and the defendant to Special Agent Zayas.   The call was made to the undercover phone number previously provided to The defendant and the CW.   Special Agent Zayas was acting in an undercover capacity and posing as the CW's fictitious cousin "Rico."   The CW advised Special Agent Zayas that he was with "the guy" in close proximity.   Special Agent Zayas requested to speak directly with the defendant. After a short pause, in which the CW could be heard speaking to the defendant, the CW advised Special Agent Zayas that "he" did not want to speak on the telephone.   Special Agent Zayas replied that he needed to be close.   The CW responded that he was a foot away from him.

During the conversation, Special Agent Zayas questioned the CW as to the manner in which he would be paid.   The CW further stated that he (the defendant) wanted the job completed involving the guy with the truck.   Special Agent Zayas responded that it was going to cost him "ten thousand" and the other "five."   Special Agent Zayas could again hear the CW speaking with the defendant.   Shortly thereafter, the CW advised Special Agent Zayas that he said it was good.

During the conversation, Special Agent Zayas again asked the CW how he was going to get paid.   Special Agent Zayas overheard the CW speaking with the defendant.   The CW returned to the call and advised that he said once the job was done, Special Agent Zayas was to send an invoice.   Special Agent Zayas questioned the CW if he had written down how he was to be paid. The CW replied, "Yes, he wrote it, it's all on a piece of paper."

During the same conversation, Special Agent Zayas requested that the CW ask the defendant how he was to prove to the defendant that he had completed the job.   Special Agent Zayas again overheard the CW speaking with the defendant.   The CW relayed that Special Agent Zayas should send a note stating he "bought the truck."   Special Agent Zayas suggested that he could send "his girl" with photos to display to the defendant .   Special Agent Zayas heard the CW explain to the defendant what he said.   The CW returned to the telephone and said that he (the defendant) wanted a note stating he, Special Agent Zayas, had "bought the truck" and to include a newspaper article.

During the same conversation, Special Agent Zayas asked the CW to tell the defendant that once the call was terminated it was going to happen and that GORDON had to be sure he wanted it done.   Special Agent Zayas overheard the CW speaking with GORDON and once done, the CW

18

advised Special Agent Zayas that he (the defendant) wanted it done and that he needed the second job done as well.

During the same conversation, Special Agent Zayas advised the CW that he intended to do the first job on the man without the truck and upon completion he would do the man with the truck. Special Agent Zayas requested that the CW relay this message to the defendant.   The CW complied with the request.   The CW returned to the telephone and stated that he (the defendant) wanted both done.

Lieutenant Karelas and Special Agent Oppedisano monitored the CW and the defendant during the above described phone call with Special Agent Zayas.   Special Agent Oppedisano observed the defendant standing next to CW in very close proximity.   Special Agent Oppedisano observed the CW appear to relay the messages and questions that Special Agent Zayas had asked and observed the defendant nod his head several times in the affirmative.   Special Agent Oppedisano observed the defendant writing notes to the CW while they were at the phone.   After the phone call was completed the defendant retrieved his notes from the CW and both walked back to the bunk area.

## Interview of the Cooperating Witness

On April 7, 2015, Trooper Collins and Special Agent Oppedisano spoke with the CW regarding his contact with the defendant on the previous day.   The CW stated that when the defendant arrived in Dorm 3 he immediately began talking to him about his cousin "Rico." The CW stated that he and the defendant sat at a table where the defendant examined and compared the writing and the address for his "cousin Rico" from previously sent letters and greeting cards.   The CW explained that the defendant still wanted "Rico" to kill the cop and the other guy.

The CW stated that soon after the defendant's transfer back to Dorm 3 they both walked to the phone and called Rico.   The CW stated that the defendant was writing notes to him during the call specifically about the "proof."   The CW explained that the defendant told him that he wanted "Rico" to send a note to the defendant that he "bought the truck," which was code that he killed Trooper Graham.   Additionally, the CW stated that the defendant requested that "Rico" mail a newspaper article to verify the death.

The CW stated that the defendant was "excited" that "Rico" was finally going to kill Trooper Graham and the witness.   The CW explained that the defendant told him that some of his charges were recently dismissed and that if both Trooper Graham and the other guy were gone his case would be gone too.   The CW stated that the defendant did not want to speak on the phone because he was worried that someone may be cooperating with the police.

## Recorded Conversation Between GORDON And The Cooperating Witness

On April 14, 2015, at approximately 1:45 p.m., Trooper Collins and Special Agent Oppedisano had the CW brought from Dorm 3 to the Health Services Unit.   At the Health Service

Unit, MSO Lieutenant Karelas outfitted the CW with an electronic recording device and the CW was then brought back to Dorm 3.

On April 14, 2015, at approximately 2:30 p.m., Trooper Collins, MSO Lieutenant Karelas, and Special Agent Oppedisano monitored a letter delivery to GORDON in Dorm 3.   The letter was drafted by Trooper Collins and Special Agent Oppedisano, acting in an undercover capacity and posing as "Rico," the fictitious cousin of the CW.   The letter was written on the inside of a "Congratulations" greeting card and read in its entirety:

Hello my friend second job is done do you want to wait a week to buy truck?   Will send proof when its in the news ok?   You and [CW] call me soon talk about $ and truck God Bless."

The purpose of this letter was to give the defendant the impression that Frank Perlak was killed and that "Rico" was awaiting further instruction as to when the defendant would like Trooper Graham killed.   Trooper Collins, MSO Lieutenant Karelas, and Special Agent Oppedisano monitored the delivery of the letter via the house of correction's surveillance/security cameras.

On April 14, 2015, at approximately 2:36 p.m., they observed the defendant retrieve his mail, to include the undercover congratulations greeting card, from the Officer's Station.   The defendant immediately walked to the CW, who was seated at a round table within Dorm 3.    The defendant sat down at the table with the CW and passed the congratulations greeting card to the CW.   The CW and the defendant engage in conversation while playing card games.   At approximately 3:33 p.m., the CW stood up and walked to the phone area of Dorm 3.   At the same time, Special Agent Oppedisano received a call from the CW who informed him that he was finished with his conversation with the defendant.   Special Agent Oppedisano instructed the CW to return to his bunk and wait for further instruction.

**Debrief of Cooperating Witness**

Trooper Collins, MSO Lieutenant Karelas, and Special Agent Oppedisano retrieved the electronic recording device from the CW.   Prior to downloading and reviewing the recording, Special Agent Oppedisano spoke with the CW about his conversation with the defendant.   The CW stated that immediately after the defendant received the letter in the mail he brought the letter over to him.   The CW further stated that the defendant told him that he wanted the cop killed and that the body not to be found.   The CW went on to say the defendant told him that if the cop and the other guy (Frank Perlak) were gone then his case will go away.   The CW related that the defendant said that he hoped that Rico burned the house or made it look like an accident.

**Search of the Defendant's Bunk Area.**

On April 15, 2015, Magistrate Judge Dein authorized a search of the defendant's personal belongings that had been collected in bags from in and around his bunk are.   The items were

searched on April 17, 2015 and all but one of the letters and card sent to the defendant as part of the investigation were located and seized.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:     */s/ DAVID G. TOBIN*
        DAVID G. TOBIN
        Assistant U.S. Attorney
        RACHEL HEMANI
        Assistant U.S. Attorney

Date: February 26, 2016

CERTIFICATE OF SERVICE

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/David G. Tobin*
DAVID G. TOBIN
Assistant U.S. Attorney