## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| **UNITED STATES OF AMERICA** |
| **v.** |
| **ANDREW S. GORDON** |

**Criminal No. 1:15-cr-10117-PBS**

## EMERGENCY MOTION FOR REDUCTION OF SENTENCE PURSUANT TO 18 U.S.C. § 3582(c) (COMPASSIONATE RELEASE)

NOW COMES defendant Andrew Gordon, through undersigned counsel, and moves for reduction of his sentence to time served with a term of home confinement as a condition of supervised release due to the uncontrolled spread of COVID-19 at FCI Butner Low, where he is serving the sentence imposed by this Court. In support of this motion, the defendant shows the Court the following.

## INTRODUCTION

The COVID-19 pandemic has wreaked havoc across the globe, infecting more than 7.1 million people and killing more than 407,000.[1] In the United States, over 1.9 million people have tested positive and over 111,000 have died.[2]

---

[1] COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins, Johns Hopkins Univ. & Med. Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited June 9, 2020).
[2] *Id.*

The virus has made its way into federal prisons and has hit FCI Butner especially hard. The situation at FCI Butner Low is dire—it now has the largest outbreak of any BOP facility in the country. At least 661 inmates and 13 staff members have tested positive for COVID-19, and nine inmates have died since May 19, 2020.[3] Because testing has been limited until recently, the true number of infected people at Butner is unknown.[4] Indeed, the June 3, 2020 edition of the Raleigh News & Observer contains an article with the headline, "Butner starts mass COVID testing after 6 inmates die in 8 days."[5]

The rapid spread of the virus at Butner cannot be overstated. On March 30th, FCI Butner had two reported cases among the inmate population of COVID-19 and one staff member.[6] By April 1st, BOP reported there were "nine confirmed cases of the coronavirus" at Butner, a 300% increase in just two days.[7] As of June 9, 2020 FCI Butner Low has 617 inmates and 7 staff members currently infected with the virus.[8] This is in addition to 44 inmates and 6 staff who are listed as having

---

[3] *Charles Hallinan v. Thomas Scarantino*, Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Class Action Complaint for Injunctive and Declaratory Relief (Case No. 5:20-hc-02088-FL pending in the U.S. District Court for the Eastern District of North Carolina), available at https://www.acluofnorthcarolina.org/sites/default/files/13117120781.pdf; at 21; COVID-19 Coronavirus: COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 7, 2020).
[4] *Id*. at 3.
[5] Butner Starts Mass COVID Testing After 6 Inmates Die in 8 days, Raleigh News and Observer, (June 3, 2020), https://www.newsobserver.com/news/coronavirus/article243210251.html.
[6] Two More Cases of COVID-19 Reported at Butner Federal Prison in North Carolina, Raleigh News and Observer, April 1, 2020,
https://www.newsobserver.com/news/coronavirus/article241692281.html.
[7] https://www.bop.gov/coronavirus/index.jsp.
[8] https://www.bop.gov/coronavirus/index.jsp.

recovered after being infected.[9]  Put another way, a majority of the 1,156 total

inmates at Butner Low have been infected with the coronavirus.[10]

A number of factors make being incarcerated at Butner particularly

dangerous, especially for people with pre-existing medical conditions.

> People housed at Butner—a complex that is well over
> capacity—are packed into crowded dormitories, small
> cells, and narrow hallways. They cannot physically
> distance themselves from others or self-quarantine. They
> cannot ensure that others are effectively quarantined if
> they are infected. Instead, they must sleep within a few
> feet of one another—often in small cubicles—use
> communal bath facilities, and line up close to one another
> several times a day for food and medicine.[11]

To make matters worse, Mr. Gordon already suffers from chronic lymphocytic

leukemia and is prescribed immunosuppressants.   These otherwise manageable

conditions are risk factors that make him uniquely vulnerable to severe illness in

the current environment.[12]  And right before filing this motion, undersigned counsel

learned that he has tested positive.

In light of this, Mr. Gordon respectfully asks the Court to reduce his sentence

to time served with a term of home confinement as a condition of supervised

release.  For a person with his risk factors, the coronavirus pandemic, which public

health experts and policymakers recognize is especially dangerous in the confines of

---

[9] *Id.*

[10] https://www.bop.gov/locations/institutions/buf/.

[11] *Charles Hallinan v. Thomas Scarantino*, Petition for Writ of Habeas Corpus Under 28 U.S.C. §
2241 and Class Action Complaint for Injunctive and Declaratory Relief (EDNC),
https://www.acluofnorthcarolina.org/sites/default/files/13117120781.pdf at 2.

[12] People Who Are at Higher Risk for Severe Illness. Centers for Disease Control and Prevention;
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

correctional institutions, is an extraordinary and compelling circumstance. The threat presented, combined with the totality of the circumstances, warrants an immediate sentence reduction to time served.

## STATUTORY FRAMEWORK

The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

(1) in any case--

(A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—**

(i) **extraordinary and compelling reasons warrant such a reduction; . . .**

**\*\*\*\*\***

**and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission**.

18 U.S.C. § 3582(c)(1)(A). Thus, the statutory requirements for sentence reduction are that the court: (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

**BACKGROUND FACTS**

On December 8, 2017, this Court re-sentenced Mr. Gordon to a term of 120 months for his conviction for Use of Interstate Commerce Facilities in the Commission of Murder For Hire, in violation of 18 U.S.C. 1958 [ECF No. 122]. Absent compassionate release, his projected release date is April 27, 2024.

Mr. Gordon submitted a request for compassionate release to Tamara Lyn, the warden at FCI Butner, on March 29, 2020.  (Exhibit A).  The warden rejected his request twice- - on April 15, 2020 and again on April 28, 2020 (Exhibits B and C).  Mr. Gordon now seeks compassionate release from this Court.

**ARGUMENT**

**A.  The Court has the authority to consider Mr. Gordon's motion.**

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the BOP, Congress expanded the statute in the First Step Act of 2018. Pub. L. 115-391 § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018).  As amended, § 3582(c)(1)(A)(i) now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

The reason for the expansion to include defense-filed motions was the "documented infrequency with which the BOP filed motions for a sentence reduction

on behalf of defendants." *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the exclusive channel through which a sentence reduction could be considered by courts." *Id.*

In this case, the timing provision has been satisfied in two ways. First, Mr. Gordon submitted a request for reduction in sentence to the warden of his facility and was declined, providing the basis for the Court to consider this motion. *See United States v. Mcfarlane*, 2020 WL 1866311 at *1 (D. Mass. April 14, 2020) ("Defendant Macfarlane has requested that the BOP file a motion to reduce his sentence and the BOP has denied that request. The Court finds that defendant has therefore fully exhausted his administrative rights and his motion is properly before this Court."); *United States v. Haney*, --F. Supp. 3d--, 2020 WL 1821988 at *3 (S.D.N.Y. April 13, 2020) (to satisfy §3582(c)'s exhaustion requirement, a defendant must either exhaust administrative remedies with the BOP or "simply wait 30 days after serving his petition on the warden of his facility before filing a motion in court.").

Second, the Court may excuse the 30-day wait period on equitable grounds, and COVID-19 is one such ground. *See*, *e.g.*, *United States v. Bess*, 2020 WL 1940809 at *4-5 (W.D.N.Y., April 22, 2020) (noting "the Covid-19 pandemic presents extraordinary circumstances that are beyond [the defendant's] control. Were this Court not to excuse [the defendant's] failure to exhaust, the outcome easily could be

fatal."); *United States v. Guzman Soto*, ___ F.3d ___, 2020 WL 1905323 at *1 (D.

Mass. April 17, 2020) (Finding that "[d]efendant need not fully exhaust all

administrative rights to appeal a failure of the Bureau of Prisons ("BOP") to bring a

motion for compassionate release.").[13]

Because Mr. Gordon has exhausted his administrative remedies, and because

his claims require immediate judicial review, this case is properly before the Court.

### B. Mr. Gordon's vulnerability to COVID-19 is an extraordinary and compelling reason for an immediate sentence reduction to time served.

The compassionate release statute does not expressly define or limit what

constitutes an "extraordinary and compelling" reason for a sentence reduction.

Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is

usual, customary, regular, or common," BLACK'S LAW DICTIONARY (10th ed.

2014). Its definition of "compelling need," is one "so great that irreparable harm or

---

[13] *See also United States v. McCarthy*, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (excusing exhaustion requirement "in light of the urgency of [the defendant's] request, the likelihood that he cannot exhaust his administrative appeals during his remaining 26 days of imprisonment, and the potential for serious health consequences"); *Colvin*, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (excusing exhaustion requirement "[i]n light of the urgency of [the d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences"); *United States v. Zukerman*, 2020 WL 1659880, at *3-4 (S.D.N.Y. Apr. 3, 2020) (excusing exhaustion requirement, notwithstanding the fact that the defendant's term of imprisonment would not end, at the earliest, until May 2022, in light of the defendant's "advanced age and compromised health, combined with the high risk of contracting COVID-19 at [FCI] Otisville," where at the time of the order, at least one inmate had tested positive for the disease); United *States v. Perez*, 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020) (excusing exhaustion requirement for sentence ending approximately three weeks after the defendant's request to the BOP because "even a few weeks' delay carries the risk of catastrophic health consequences for [the defendant]," such that requiring exhaustion "would result in undue prejudice and ... [be] both futile and inadequate.").

injustice would result if [the relief] is not [granted]." *Id.* The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes. The grave risk to Mr. Gordon from continued incarceration at FCI Butner provides a compelling reason for his immediate release.

1. *The Court has authority to find extraordinary and compelling reasons other than those expressly identified in the commentary to U.S.S.G. § 1B1.13.*

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

However, the policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP. For that

reason, "a growing number of district courts have concluded the Commission lacks" a

policy statement applicable to the post-First Step Act statute. *United States v.*

*Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020); *see also*

*United States v. Brown*, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019) (citing cases).  In

*United States v. Cantu*, the Court explained:

> Given the changes to the statute, the policy-statement provision that
> was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits
> with the statute and thus does not comply with the congressional
> mandate that the policy statement must provide guidance on the
> appropriate use of sentence-modification provisions under § 3582.

No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). Similarly, in

*Redd*, the court noted that § 1B1.13 "by its terms applies only to motions for

compassionate release filed by the BOP Director, not motions filed by

defendants." 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020). Therefore, the

court concluded, "there does not currently exist, for the purposes of satisfying the

First Step Act's 'consistency' requirement, an 'applicable policy statement.'" *Id.*

Even where courts have not deemed § 1B1.13 entirely inapplicable due to

the lack of amendment, they have held that judges have authority based on the

catch-all provision in Application Note 1(D) to find extraordinary and compelling

reasons other than those listed. *See, e.g.*, *United States v. Fox*, No. 2:14-cr-03-

DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (stating that the existing policy

statement provides "helpful guidance," but "is not ultimately conclusive given the

statutory change"). In *Redd*, the court explained that "Application Note 1(D)'s

prefatory language, which requires a determination by the BOP Director, is, in

substance, part and parcel of the eliminated requirement that relief must be

sought by the BOP Director in the first instance." 2020 WL 1248493, at *7 (citing cases); *see also United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

Accordingly, this Court has the authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and compelling basis for a sentence reduction, regardless of whether it falls within one of the existing categories in the § 1B1.13 commentary.

### 2. *COVID-19 is an unprecedented and rapidly-expanding global health emergency.*

Almost three months ago, on March 11, 2020, the World Health Organization officially classified the strain of coronavirus which causes COVID-19 as a pandemic.[14] "COVID-19 is a serious disease" that makes certain populations of people severely ill and can lead to death.[15] The current best estimate is that the

---

[14] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.
[15] Declaration of Chris Beyrer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, ¶ 5 (Mar. 16, 2020) (Exhibit D)).

fatality rate among all demographics "is 5-35 times the fatality associated with influenza infection."[16]

On March 26, 2020, the United States became the global leader in COVID-19 infections.[17] That remains the case today.[18] Experts predict that the pandemic is not likely to end any time soon and a second wave will come in the fall.[19]

### 3. COVID-19 is particularly deadly in a prison setting.

Conditions of imprisonment create the ideal environment for the transmission of contagious diseases.[20] "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."[21] The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been

---

[16] *Id.*

[17] Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, Business Insider (Mar. 26, 2020), *available at* https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china- 2020-3.

[18] World Health Organization, Coronavirus disease (COVID-19): Situation Report – 112 (May 11, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200511-covid-19-sitrep-..

[19] Len Strazewski, "Havard Epidemiologist: Beware COVID-19's second wave this fall," American Medical Association (May 8, 2020); https://www.ama-assn.org/delivering-care/public-health/harvard-epidemiologist-beware-covid-19-s-second-wave-fall.

[20] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases, 1047-1055 (Oct. 2007), https://doi.org/10.1086/521910.

[21] Centers for Disease Control and Prevention (CDC), Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019- ncov/community/correction-detention/guidance-correctional-detention.html.

exposed to COVID-19 in the surrounding community or other regions.[22]

Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons.[23] Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content.[24] Medical care of prisoners is limited in the best of times.[25]

Especially concerning is the threat of spread from asymptomatic persons who contract the virus. These asymptomatic persons show no, or limited symptoms, yet they continue to spread the virus. See *United States v. Scparta*, __ F.Supp. 3d __, 2020 WL 1910481, at *3 (S.D.N.Y. April 20, 2020) (criticizing the "senselessness" of Butner's quarantine policy based on "two undisputed scientific facts: (1) individual who are asymptomatic are capable of spreading COVID-19, and (2) individuals infected with COVID-19 may not show any symptoms for

---

[22] *Id.*

[23] Michael Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about- becoming-coronavirus-incubators.

[24] Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA JOURNAL (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can- prisons-contain-coronavirus.

[25] *See* U.S. Dep't of Justice Office of the Inspector General, Review of the Federal Bureau of Prisons' Medical Staffing Challenges (Mar. 2016), https://oig.justice.gov/reports/ 2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists); David Patton, Statement from Federal Defenders of New York, Federal Defenders of New York (Mar. 8, 2020), https://federaldefendersny.org/about- us/news/statement-from-federal-defenders-of-new-york.html.

days.").

        4. *Butner has specific features that make it more dangerous than other prisons which is why it is experiencing the worst COVID-19 outbreak of any BOP facility in the county.*

In *United States v. Bess*, 2020 WL 1940809 at *8 (W.D.N.Y. April 22, 2020), the court found, "the conditions at Butner are exceptionally dangerous." The problems the CDC identified in prison settings are present to a unique degree at Butner.[26] This explains why Butner Low now has the highest number of infected inmates of any BOP facility in the country.[27] Given asymptomatic transmission, the true number of infected people at Butner is likely much higher.[28] *See also United States v. Scparta*, supra, at *3 ("FCI Butner has had about seventy confirmed cases of COVID-19, and because testing is severely limited, the actual numbers are certainly far higher. In these circumstances, community spread through individuals not showing symptoms is inevitable...").

On top of the regular issues in a prison setting that make it a tinderbox for COVID-19, Butner is overcapacity.[29] Butner Low is one in a collection of facilities designed to hold no more than 3,998 people and there are currently 4,438 people

---

[26] *Charles Hallinan v. Thomas Scarantino*, Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Class Action Complaint for Injunctive and Declaratory Relief (EDNC), https://www.acluofnorthcarolina.org/sites/default/files/13117120781.pdf at 20; COVID-19 Coronavirus: COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 27, 2020).

[27] ACLU class action complaint at 20; COVID-19 Coronavirus: COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited June 7, 2020).

[28] *Id.*
[29] *Id.* at 3.

incarcerated there.[30] Social distancing is impossible.  Butner Low contains eight dormitory-style housing units, each holding about 140–160 men.[31] The housing units are open rooms divided into cubicles ranging in size from about 9' x 7' to about 11' x 7', with walls about 5' to 6' high.[32] "Because of the cubicle arrangement, most people housed in Butner Low sleep within six feet of several other people. In other words, the hundreds of men in Butner Low—many of them elderly or medically vulnerable—spend several hours every night within the CDC's suggested minimum physical distancing zone."[33] In finding that the conditions at Butner were "exceptionally dangerous" the Court in *Bess* cited the cramped living quarters. Inmates at Butner Low are "housed in a 150-man dorm that is divided up by a 4-foot wall into 3-man cubicles."  *Bess*, 2020 WL 1940809 at *8.

Cubicles are not the only shared spaces where inmates are close together. "People housed in Butner Low share a small number of toilets, showers, and sinks across the entire housing unit. The fixtures are all within three feet of each other, meaning, people 'are in very close contact in the bathrooms.'"[34] For meals, people line up in their housing units standing just a few feet apart for approximately ten minutes, and there are packed lines for phones and computers, which are stationed just a few feet apart and not cleaned in between uses.[35]

---

[30] *Id*.; See PREA Audit Report, National PREA Resource Center, Bureau of Justice Assistance 1 (Apr. 2, 2017), https://www.bop.gov/locations/institutions/buh/PREA_butner.pdf.
[31] *Id*. at 28.
[32] *Id*. at 27.
[33] *Id*. at 29.
[34] *Charles Hallinan v. Thomas Scarantino*, Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Class Action Complaint for Injunctive and Declaratory Relief (EDNC), https://www.acluofnorthcarolina.org/sites/default/files/13117120781.pdf at 32.
[35] *Id*. at 30-31.

Given this backdrop, the protective measures BOP has taken are inadequate. "Although the facility had passed out masks to inmates, [some] inmates were only using them sporadically and also were inconsistent about washing their hands." *Bess*, 2020 WL 1940809 at *8. Additionally, some of the cloth masks provided do not fit and some are made of thin, translucent material.[36] "People housed at Butner Low are responsible for cleaning their own masks, but at points during the lockdown, laundry access has been limited. If masks are damaged or lost, there is no means to repair or replace them. [Inmates] are not given gloves."[37] What's more, BOP is inconsistent about enforcing the requirement to wear masks.[38] Not all staff members wear masks.[39] Some incarcerated people also do not wear their masks.[40] Many inmates also have regular contact with inmates from other housing units due to work.[41]

Butner Low also houses a large number of medically vulnerable inmates, many of whom, like Mr. Gordon, are at high risk for severe illness from COVID-19:

> A primary function of Butner Low is to house individuals designated as Care Level 3. These are men "who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications, . . . [such as] [c]ancer in partial remission, advanced HIV disease, severe mental illness in remission on medication, severe congestive heart failure, and end-stage liver disease."[42]

---

[36] *Id*. at 32.
[37] *Id*.
[38] *Id*.
[39] *Id*.
[40] *Id*.
[41] *Id*. at 33.
[42] *Id*. at 28.

The situation at FCI Butner is so bad, that a model inmate with a pre-existing condition fled the facility and spoke to the media about the conditions inside.[43]  He described how watching the numbers of positive cases rise without being able to adequately protect himself caused fear to take over, leading him to make the decision to flee, a decision he perceived as necessary to save his life. *Id*. He described the shortages of cleaning materials like soap and explained that social distancing was impossible at Butner.  He turned himself in three weeks later, hoping additional protections would be put in place. *Id*.

     5.   *Outbreaks across BOP Prisons and widespread calls for releasing medically vulnerable inmates*

In some cases, DOJ has taken the position that there is no need for compassionate release because BOP is well-equipped to contain COVID-19.  The facts show otherwise.  Although FCI Butner has the worst outbreak, COVID-19 is spreading within the BOP's walls nationwide.   Despite the fact that the BOP is doing only sporadic testing, the confirmed BOP numbers as of June 7, 2020, are as follows:

- 5,935 inmates with COVID-19 (3936 have recovered)

- 636 staff with COVID-19 (452 have recovered)

- 78 inmate deaths from COVID-19

- 88 infected BOP facilities (both prisons & halfway houses)[44]

---

[43] Dan Kane, Escapee from NC federal prison turns himself in after three weeks on the run. The News & Observer (April 21, 2020). https://www.newsobserver.com/news/local/article242170326.html

[44] *See* https://www.bop.gov/coronavirus/ (last visited May 27, 2020).

This chart[45] – current through June 8, 2020 – summarizes the spread of COVID-19 cases in BOP:



It also bears repeating that these are just the confirmed infections. As the judge in *United States v. Caddo* noted, "it is unknowable whether BOP detainees or inmates have Covid-19 until they are tested, and BOP has not conducted many or any such tests because, like the rest of the country, BOP has very few or no actual Covid-19 test packets." Order at 5, *United States v. Caddo*, No. 3:18-cr-08341-JJT (D. Ariz. Mar. 23, 2020).

Based on this, the public health community is insistent on the critical need to rapidly reduce our prison populations, both for the health of our inmates and

---

[45] Available at www.levittandkaiser.com.

the health of the community as a whole:

> It is . . . an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible . . . Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Exhibit D, ¶¶ 17, 19. As another physician sums it up, "We need to take the unprecedented step TODAY of providing urgent release to everyone in the jails who is at risk of serious morbidity and mortality from COVID."[46]

Members of Congress have likewise sounded the alarm regarding the need to do something for inmates in Mr. Gordon's situation. On March 23, 2020, a bipartisan group of fourteen senators wrote to Attorney General Barr and the Director of the Bureau of Prisons to express "serious concern for the health and wellbeing" of those inmates "most vulnerable to infection."[47] They noted that "[c]onditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease." The senators called on the BOP to use existing tools like the elderly prisoner home confinement program and compassionate release to release vulnerable inmates from prison.[48]

Recognizing the danger to those incarcerated at Butner, on May 26, 2020, the American Civil Liberties Union filed a class action lawsuit asking for the

---

[46] Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20, 2020) (quoting Rachael Bedard, Rikers Island Geriatrician).
[47] Exhibit E.
[48] *Id.*

immediate release of "enough incarcerated people — starting with those who are medically vulnerable and appropriate candidates for compassionate release or home confinement — to ensure that the remaining incarcerated people and staff can comply with CDC guidelines for physical distancing."[49]

Every day, more and more courts are recognizing the severe threat posed by COVID-19 – especially to inmates who, like Mr. Gordon, present health-related risk factors for contracting a deadly case of this disease, and especially in light of the fact that prisons are, as one court as put it, "tinderboxes for infectious disease." *United States v. Rodriguez*, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020); *see, e.g.*, *United States v. Zukerman*, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (granting compassionate release to defendant with "serious underlying medical conditions" such as "diabetes and obesity"); *United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (finding "extraordinary and compelling reasons justifying . . . immediate release" where defendant has "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19"); *Rodriguez*, 2020 WL 1627331, at *7 (granting compassionate release to defendant with Type II diabetes because it placed him "in the higher risk category for developing more serious disease"); *United States v. Jepsen*, 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) (granting

---

[49] ACLU Sues to Protect People At Butner Federal Prison from COVID-19 (May 26, 2020), https://www.aclu.org/press-releases/aclu-sues-protect-people-butner-federal-prison-covid-19-0; COVID-19 Coronavirus: COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 26, 2020) [hereinafter COVID-19 Cases].

compassionate release to defendant who "is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19"); *United States v. Perez*, No. 1:17-cr-513-AT, Dkt. No. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Gonzalez*, 2020 WL 1536155, at *2-3 (E.D. Wash. Mar. 31, 2020) (granting compassionate release to defendant who had served 10% of her sentence because her age (64 years old) and chronic obstructive pulmonary disease make her "most susceptible to the devastating effects of COVID-19"); *United States v. Muniz*, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020) (finding extraordinary & compelling reasons supporting compassionate release where defendant was "diagnosed with serious medical conditions" including "diabetes" that made him "particularly vulnerable to severe illness from COVID-19"); *United States v. Campagna*, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release to immunocompromised defendant); *see also United States v. Esparza*, No. 1:07-cr-294- BLW, Dkt. No. 124 (Apr. 7, 2020) (finding extraordinary and compelling reasons to grant compassionate release where defendant had "multiple risk factors for complications from COVID-19 infection").

6. *Given his risk factors, COVID-19 poses a threat of serious illness or death to Mr. Gordon.*

The Court may recall recommending to BOP that Mr. Gordon be designated to a facility where his condition, chronic lymphocytic leukemia ("CLL"), could be treated. CLL puts Mr. Gordon at unique risk in the current environment, as does the fact that he is prescribed Humira, an immunosuppressant.

Exhibits F and G to this motion are affidavits from Dr. Mayzar Shadman, an academic physician at the Fred Hutchinson Cancer Research Center in Seattle, and Theodore Frank, the medical director for the Cardiac Transplant Program and the Pulmonary Hypertension Program at the Sanger Heart and Vascular Institute at Carolinas Medical Center in Charlotte. Dr. Shadman has conducted studies on chronic lymphocytic leukemia (CLL) and COVID-19, and published extensively on the risks COVID-19 poses to someone with CLL.

According to these physicians, the risks to Mr. Gordon include a 2-4 fold higher risk of mortality from COVID-19, a higher risk for a complicated treatment course, and a need for comprehensive and multidisciplinary medical management. In short, COVID-19 is much more likely to lead to serious complications, or worse, for Mr. Gordon than it is for others.

C. **Mr. Gordon's positive test for COVID-19 makes the need for relief urgent**.

As a preliminary matter, in a number of cases courts have ordered compassionate release for positive-testing inmates. *See*, *United States v. Brown*,

Case No. 2:18-cr-360, Dkt. No. 35 (N.D. Ala. May 22, 2020) (COVID-19-positive, asthma, only one year into 60 month sentence); *United States v. Arreola-Bretado*, Case No. 3:19-cr-3410, Dkt. No. 50 (S.D. Cal. May 15, 2020) (granting compassionate release to defendant who tested positive for COVID-19 after concluding she will receive superior medical care outside of the custody of the Otay Mesa detention facility); *United States v. Fischman*, 16-cr-00246-HSG-1, ECF No. 76 (N.D. Cal. May 1, 2020) (granting compassionate release from Terminal Island to COVID-19-positive defendant); *United States v. Kriglstein*, 1:16-cr-00663-JCH-1, ECF No. 60 (D.N.M. Apr. 27, 2020) (staying for 5 days release of defendant who was tested for COVID-19 as condition of order granting compassionate release, with positive result); *United States v. Huntley*, No. 13-cr-119-ABJ, ECF No. 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19 while motion was being litigated); *Yeury J.S. v. Decker*, Case No. 2:20-cv-5071-KM, ECF. No. 20 (D.N.J. May 11, 2020) (ordering release for COVID-19-positive immigration detainee).

Now that he has tested positive, Mr. Gordon needs treatment and quarantine. Any claim that he will receive adequate treatment at Butner Low is called into question by fact that of 11 fatalities nationwide in BOP since May 28, 8 are inmates from Butner Low. They are as follows:

1. May 28, 2020, Dongfan Greg Chung (FCI Butner Low)

2. May 28, 2020, Bernardo Luis Olarta-Loaiza (FCI Butner Low)

3. May 29, 2020, Steve Arthur Robinette (FCI Butner Low)

4.       May 31, 2020, David Grant (FCI Butner Low)

5.       May 31, 2020, Steve Arthur Robinette (FCI Butner Low)

6.       June, 1, 2020, Juan Ledoux-Moreno (FCI Butner Low)

7.       June 1, 2020, Daniel Lee Vadnais (FCI Lompoc)

8.       June 2, 2020, Robert Herndon (FMC Devens)

9.       June 3,2020, Bobby Lee Medford (FCI Butner Low)

10.      June 3, 2020, Stephen Cook (FMC Lexington)

11.      June 4, 2020, Andrew Charles Markovci (FCI Butner Low)[50]

Home confinement makes recovery much more likely as the CDC's safety guidelines are more likely to be met at home rather than at Butner Low. And if Mr. Gordon recovers, he is still at risk so long as he is at Butner Low. This is so because, as the WHO has cautioned, there is no scientific evidence that shows that once someone has the virus, they are immune to it.[51] As a result, Mr. Gordon's continued detention in a facility rife with the virus constitutes a continuing danger.

### D. Considering all § 3553(a) factors, including the COVID-19 pandemic, Mr. Gordon has served a sufficient sentence for his crime.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under all of the

---

[50] Each death is summarized at www.bop.gov/resources/press_releases.jsp.
[51] https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19.

circumstances in this case, the Court should conclude that the time that Mr. Gordon has already served is sufficient to satisfy the purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents in light of Mr. Gordon's vulnerability. Although the circumstances of the offense lead to the sentence that this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes continued exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to "contagious diseases caused by overcrowding conditions"). The § 3553(a) factors can be met in this case by a reduced sentence of time served with an order of home confinement as a condition of supervised release.

Additionally, Mr. Gordon's conduct while in prison speaks to the question of whether the purposes of punishment have been met. Under *Pepper*, the Court must consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." *Id*. at 492.

The Court may recall that when Mr. Gordon was sentenced, he had no friends and no letters of support. Eighteen letters attached hereto, one of which is from a parole officer, attest that Mr. Gordon has come a long way. (Exhibit K). He has made the most of his time in prison, enrolling in numerous courses, working in Unicor, and maintaining a clean disciplinary record. (Exhibit I). Under its PATTERN system, BOP rates him as a minimal risk of recidivism. (Exhibit H). Today's Andrew Gordon is extremely remorseful for his offense, and he has written this Court a letter to that effect. (Exhibit L).

If released, Mr. Gordon intends to live in Charlotte, North Carolina, over 800 miles from his victim, and is willing to abide by any order limiting him to staying in that jurisdiction.

Mr. Gordon accordingly requests that his sentence be reduced to time-served followed by a three years of supervised release with a term of home-confinement or other non-custodial conditions the Court sees fit to impose.

### E. This Court has the authority to order Mr. Gordon to be released immediately to home confinement and to quarantine at home.

Numerous courts have ordered immediate release with self-quarantine at home in light of the pandemic. *E.g.*, *United States v. Rodriguez*, 2020 WL 1627331, at *12 (E.D. Pa., April 1, 2020); *United States v. Bess*, 2020 WL 1940809, at *12 (W.D.N.Y., April 22, 2020); *United States v. Jackson*, 2020 WL 1955402, at *6 (S.D. Tex., April 23, 2020). Some have expressly overruled government requests for 14-day in-prison quarantines. *See*, *e.g.*, *United States v. Robinson*, 2020 WL 1982872, at *2-*3 (N.D. Cal. April 27, 2020) (while taking no position on compassionate

release, government requested in-prison quarantine; immediate release with self-quarantine ordered).

## CONCLUSION

For the foregoing reasons, Mr. Gordon respectfully requests that the Court grant reduction in sentence to time served, followed by three years supervised release, home detention and any other conditions the Court deems appropriate.

Dated: June 10, 2020

Respectfully submitted,

By his attorney,

/s/ Robert Sheketoff

Robert Sheketoff
BBO# 457340
One McKinley Square
Boston, MA 02109
(617) 367-3449

## CERTIFICATION UNDER L.R. 7.1(A)(2)

In accordance with L.R. 7.1(a), I, Robert Sheketoff, certify that I have conferred with opposing counsel and have been advised that the government will oppose the foregoing motion.

/s/ Robert Sheketoff

## CERTIFICATE OF SERVICE

The undersigned hereby certify that this document filed through the ECF system on June 10, 2020 will be sent electronically to the registered participants.

/s/ Robert Sheketoff