UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | )   Criminal No. 15-cr-10117-PBS |
| v. | ) |
| | ) |
| ANDREW GORDON | ) |
| | ) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S EMERGENCY MOTION
FOR REDUCTION OF SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)**

 The United States hereby submits this Opposition to defendant Andrew Gordon's

Emergency Motion for Reduction of Sentence (Doc. No. 135).  The defendant seeks release on

conditions on the grounds that he has contracted COVID-19 while in custody at FCI Butner,

where he is serving a ten year sentence imposed by this Court following a conviction on five

counts of use of interstate commerce facilities in the commission of murder-for-hire.  For the

following reasons, the motion should be denied.

I.  BACKGROUND

 The defendant was charged by complaint on April 15, 2015 and indicted on May 14,

2015 on one count of use of interstate commerce facilities in the commission of murder for hire.

A superseding indictment was returned on January 28, 2016 charging the defendant with five

counts of use of interstate commerce facilities in the commission of murder for hire.  On March

3, 2016, a jury convicted the defendant on all five counts. On June 28, 2016, this Court imposed

a twenty year sentence of imprisonment.  Following an appeal on the unit of prosecution, the

Court of Appeals effectively merged the five counts into one, and the Court re-sentenced the

defendant for 10 years imprisonment:  the maximum period of incarceration allowable following

the First Circuit's ruling.  The defendant is scheduled to be released by the Bureau of Prisons on April 27, 2024.

Andrew Gordon is an exceptionally dangerous man who attempted to hire a hit man to kill his wife, a Massachusetts State Police trooper, and an elderly acquaintance.  He asks this Court to release him back into the community with almost four years left on his ten year sentence—a sentence that is half of what the Court initially imposed after assessing all of the § 3553(a) factors.  The defendant, who is incarcerated at FCI Butner, tested positive for COVID-19 on June 2, 2020.  Although he recently reported respiratory symptoms to the medical staff at the facility, the medical professionals who examined him as recently as today concluded that the defendant ***did not actually have*** the symptoms that he was reporting.  *See* Exhibit A.  He remains asymptomatic.  The inevitable conclusion is that the defendant was—and is—malingering.

The defendant apparently thinks that he can trick this Court into granting the extraordinary remedy of reducing his sentence by malingering and placing the medical professionals who examined him at unnecessary risk of infection.  Indeed, his conduct demonstrates that he continues to resort to lying, deception and treating others with a callous disregard to their safety in order to achieve his desired result.  Finally, as the Court is aware, FCI Butner is a medical facility and fully capable of providing the defendant with the medical care he needs to combat COVID should he require treatment.

Accordingly, the defendant's motion should be denied without a hearing.

II.   <u>APPLICABLE LEGAL FRAMEWORK</u>

Section 3582(c) begins with the principle that "a court may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c).  The statute, adopted as part of the Sentencing Reform Act of 1984, originally permitted judicial relief only upon a motion by the

Director of Bureau of Prisons.  The provision was amended by Section 603(b) of the First Step Act, effective December 21, 2018.  Under the statute as amended, the court may consider a defendant's motion for compassionate release following the exhaustion of his or her administrative remedies with the BOP or 30 days after submitting a request to the appropriate Warden, whichever is sooner:

> The court may not modify a term of imprisonment once it has been imposed except that, . . . the court, upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment…

18 U.S.C. § 3582(c)(1)(A) (emphasis added).  The First Step Act did not amend the eligibility requirements for compassionate release, which are set forth in 18 U.S.C. § 3582(c)(1)(A) and Section 1B1.13 of the United States Sentencing Guidelines.  The court can only modify a sentence if, "after considering the factors set forth in section 3553(a) to the extent they are applicable," it finds that "extraordinary and compelling reasons warrant such a reduction," 18 U.S.C. § 3582(c)(1)(A)(i); or that the defendant is at least 70 years old and has served at least 30 years in prison, among other things.  18 U.S.C. § 3582(c)(1)(A)(ii).  In either case, the proposed reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).

The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13 Application Note 1. These include an assessment of the defendant's medical condition, age, family circumstances, and other reasons:

> (A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant – The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

U.S.S.G. § 1B1.13 Application Note 1.

The policy statement is not the only source of criteria the court may apply in determining whether "extraordinary and compelling reasons" exist to justify a reduction. Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* at App. Note 1(D).  Accordingly, a court may grant compassionate release not only on grounds specified by the

Sentencing Commission, but also those set forth in the relevant BOP regulation governing compassionate release.

That regulation appears at BOP Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  This program statement was amended effective January 17, 2019, following passage of the First Step Act.  It replaces the previous program statement, 5050.49, CN-1.

Program Statement 5050.50 contains standards that are both more extensive than and slightly different from those stated in the § 1B1.13 policy statement.  As is relevant here, the program statement defines a "debilitated medical condition" as follows:

> Debilitated Medical Condition. RIS[1] consideration may also be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover. The BOP should consider a RIS if the inmate is:
>
> - Completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or
>
> - Capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours.
>
> The BOP's review should also include any cognitive deficits of the inmate (e.g., Alzheimer's disease or traumatic brain injury that has affected the inmate's mental capacity or function).  A cognitive deficit is not required in cases of severe physical impairment, but may be a factor when considering the inmate's ability or inability to reoffend.

Program Statement 5050.50 at 5.

The program statement's provisions regarding the class of inmates eligible for compassionate release is also slightly different from the related provision in Section 1B1.13.  To the extent that the program statement and the policy statement conflict, it is the policy statement –

---

[1] RIS refers to a "reduction in sentence."  Program Statement 5050.50 at 4.

*i.e.*, the source directly authorized by statute – that is binding.  An interpretation in the program statement that does not contradict the policy statement, however, is entitled to some weight.  *See Reno v. Koray*, 515 U.S. 50, 61 (1995) (BOP program statements, which do not require notice and comment, are entitled to "some deference" where they reflect a "permissible construction of the statute") (internal quotation marks omitted).

The defendant bears the burden of proving that he is entitled to relief under 18 U.S.C. § 3582.  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

III.   ARGUMENT

Defendant has not established that he satisfies the requirements of the statute.  "[A] court may reduce a term of imprisonment under the compassionate release provision if it: (1) finds that extraordinary and compelling reasons warrant the reduction; (2) finds that the defendant will not be a danger to the safety of any other person or the community; and (3) the sentencing factors outlined in 18 U.S.C. §3553(a) weigh in favor of reduction."  *United States v. Khawaja*, 2020 WL 1940848 at *2 (D.N.H. April 22, 2020); *United States v. Miamen*, 2020 WL 19044490 at *2 (D.R.I. April 17, 2020).  "The defendant has the burden of showing that he or she is entitled to a sentence reduction."  *Id*.  "The court has 'broad discretion in deciding whether to grant or deny a motion for sentence reduction.'"  *Id*. (citation omitted).  Defendant cannot satisfy the three prongs of the standard.

As the Court no doubt recalls, the defendant's murder-for-hire plot was egregious, and he has shown no genuine remorse for his conduct.  The federal case arose *after* the defendant had been arrested and charged by the state for trying to hire someone to kill or severely injure his wife.  While the defendant was awaiting trial at the Billerica House of Correction on those state charges, he decided that the best way to make his state case disappear was to hire *another* hit man to murder the witnesses against him:  Trooper Andrew Graham,[2] who had posed as the hit man that the defendant tried to hire to murder his wife, and Frank Perlak, the individual who had introduced the defendant to Trooper Graham.

The defendant was dogged in his efforts to find a true hit man who would murder Frank Perlak and Trooper Graham.  He approached two different inmates at the Billerica House of Correction, asking them if they knew anyone willing to kill Trooper Graham and Frank Perlak in exchange for "any quantity of money."  The defendant even attempted to orchestrate precisely how the murders would be carried out.  Trooper Graham's murder was supposed to look like a line of duty incident, and Mr. Perlak's death was supposed to be staged as an accident—such as a house fire, which would kill anyone home at the time of the fire.  The defendant conducted due diligence on the new hit man, going so far as to hire a private investigator in order to determine if Rico Silva (the fictitious hit man) was "who he says he is," or whether he was a "C-O-P."

Finally, on April 14, 2015, federal agents posing as Rico Silva mailed a Congratulations Card to Gordon.  The card read:

> Hello my friend second job is done.  Do you want me to wait a week to buy the truck?  Will send proof when it's in the news, okay?

---

[2] Trooper Graham has been promoted to Lieutenant, but is referred to herein by the title he held during the time period relevant to the defendant's case.

In other words, Frank Perlak was dead.  And Trooper Graham was up next.

On that day, the CW wore an electronic recording device, and he was sitting with Gordon in the dormitory at the Billerica House of Corrections when the mail was distributed.  After the defendant retrieved the card, he sat at the table with the CW and showed him the card.  Then the defendant stated:  "the grey truck is the more important job.  *That* should be in the newspaper." He also whispered to the CW:  "if they don't find the body.  The grey truck.  *The cop*.  If they don't find his body, there's no suspicion.  He's gone."

In addition to the seriousness of the defendant's offense, coupled with the fact that he attempted to hire a hit man not once—but twice—in order to kill three different people, there is nothing in the defendant's background that warrants the extraordinary relief that the defendant is requesting. Andrew Gordon grew up in Framingham, Massachusetts—the son of an obstetrics surgeon and a high school career counselor.  He earned an MBA from Cornell University, and he was the founder and owner of a successful employee benefits consulting company, Gordon Analytic, which generated $1.5 million in commissions annually.  There is nothing about the history and characteristics of this defendant that warrants leniency.

B.     COVID-19 Does Not Warrant the Defendant's Release

The defendant tested positive for COVID-19 on June 2, 2020.  According to the medical professionals at FCI Butner, he remains asymptomatic despite attempting to feign symptoms— presumably, in order to deceive this Court into granting a reduction in his sentence.  As recently as today, he reported "a productive cough for 3 weeks. Increased yellow sputum from lungs and nose over the last week" and he reported that his "chest fel[t] congested for the last 3 days." What did the medical professional conclude after examining him?  That he had no coughing, no

production of sputum, no respiratory distress, clear lung sounds, and a normal temperature. *See* Exhibit A.

Given the conduct that landed the defendant in federal prison, it should not surprise this Court that he continues to engage in deception to get exactly what Andrew Gordon wants. This is a man, after all, who tried to hire a hit man to kill a State Trooper and an elderly man in order to secure his release from state custody *after* trying to hire a hit man to kill his wife. The United States urges the Court to see through this conduct, and deny the defendant's motion.

Furthermore, releasing an inmate with COVID-19 puts the community at risk. And there is nothing here to suggest the defendant's medical condition cannot be adequately treated at FCI Butner (should he require treatment). Counsel for FCI Butner reported the following this morning:

> We conducted mass testing at LSCI Butner, starting on 6/1/20. Gordon tested positive on 6/2/20 and at the time, was asymptomatic. Yesterday he presented to sick call and reported that he's had a cough for 3 weeks. He was noted to be in no acute distress, and his respirations were even an[d] non-labored. The note from 6/15 indicates that a follow-up with his provider would be scheduled for today.
>
> Following testing of all inmates at LSCI Butner, the inmates were moved according to their testing results. COVID+ symptomatic inmates were placed in a unit, and COVIC+ asymptomatic inmates were moved to separate units. Inmates testing negative are in separate units, and units have been designated as "recovered" units (for those approved to come off of the isolation units). Inmates in the COVID+ symptomatic units will remain in the unit until at least 7 days have passed with no symptoms, and following 2 negative COVID tests with at least 24 hours between tests. Inmates in the COVID+ asymptomatic units will remain in the unit for at least 14 days post-positive test, assuming no symptoms during that time, and following 2 negative COVID tests with at least 24 hours between tests.
>
> All inmates, regardless of their testing result, are continuing to receive all of the usual medical care, including any medications

through pill line, sick call appointments if needed, etc.  Medical
staff are in each unit at least 3 times per day, however they are not
charting symptom or temperature checks unless someone reports
symptoms.

Statement of Christine Kelly, Senior Attorney, Butner Legal Center.

C. Victim Statements and the Court's Imposition of a Twenty Year Sentence

The Court heard from Trooper Graham and Frank Perlak[3] at sentencing after which this

Court imposed a twenty year sentence of imprisonment.

Frank Perlak made the following statement at the defendant's sentencing—urging the

Court to impose the longest possible sentence.

> Starting with the first phone call on Labor Day weekend 2014 Mr.
> Gordon made it very clear he wanted his wife to die and/or
> disappear. His statement that killing her would be cheaper than a
> divorce shows a mindset that has marched his thought process
> throughout his various schemes to have anyone he considers a
> nuisance removed from any possible interference.
>
> The plot to kill myself and Trooper Graham has again shown his
> constant effort to eliminate problems by whatever means he can
> using whoever he can find. Killing me by setting my house on fire
> shows a total lack of concern for anyone else who could or would
> have been in the house. My wife of 50 years has nothing to do with
> this. Neither do any other family members. Yet he shows no
> concern for them.
>
> Killing Trooper Graham and having his body not found supports a
> pattern of thought that I firmly believe he will try to enact at some
> time in the future. This constant drive to kill and hide the victims
> shows that he cannot be trusted to function in a civilized world.
>
> If, as his lawyer stated, Mr. Gordon suffers from Obsessive
> Compulsive Disorder and any disruption can trigger bizarre
> behavior, then I ask the Court to hold him to the longest sentence
> allowed by law. It seems prison would be the place to give him a
> constant routine that he needs to function daily without the
> possibility of disruption.

---

[3] Mr. Perlak recently passed away.

Sentencing Tr. at 14:1-15:4.

Trooper Andrew Graham also spoke to the Court at sentencing about the impact that the

defendant's conduct had on him and his family.

> In September 2014 Frank Perlak met with Chelmsford detectives
> and me. He told us an individual named Andrew Gordon wished to
> kill his wife and was actively enlisting his help. Frank Perlak,
> because he wanted to prevent the murder of Andrew Gordon's
> wife, I would argue that Frank Perlak performed the ultimate civic
> duty. Frank Perlak did not do this because of a "don't snitch"
> mentality. Instead he did this, the right thing because he wanted to
> prevent an awful and potential tragedy.
>
> Later I would pose as a hitman. I would have telephonic as well
> face-to-face detailed conversations with Andrew Gordon. During
> these meetings Andrew Gordon solicited me first to kill his wife
> and ultimately choose to brutally and physically assault her by
> means of any means. Mr. Gordon did not care how I accomplished
> this task. He just cared that it would not come back to him.
>
> As a result of his criminal activity Mr. Gordon was arrested and
> ultimately indicted out of Middlesex Superior Court. During his
> time awaiting trial Andrew Gordon was being housed at the House
> of Corrections in Billerica. It was there we learned Andrew
> Gordon was actively soliciting violent gang members to kill me
> and Frank Perlak as we were witnesses before an upcoming state
> trial. With this members of the ATF Middlesex Sheriff's
> Department and the State Police conducted an excellent
> investigation.
>
> Evidence was later presented in the Federal Grand Jury who
> returned Indictments and Gordon was later convicted.
>
> So I'd like to say, Your Honor, this isn't in my wheelhouse. This is
> not something that I am normally comfortable doing, standing up
> and talking as a victim. Some law enforcement officers, they
> would consider this a fact, this fact that I'm up here speaking as a
> sign of weakness but I disagree. I'm standing here in defense of
> law enforcement officers and witnesses to illustrate that they are no
> different than anyone else and our lives matter. One might argue
> that there is an apathy and a recent fascination with some aspects
> of our society calling for the killing of cops. Certainly we know
> from Andrew Gordon's own words during the course of this

investigation that Andrew Gordon was, in fact, attempting to capitalize on this very movement.

In the last four months we have buried a fellow Massachusetts State Trooper, a police officer from Auburn, and I have seen the agony of a fellow trooper still recovering as a result of a recent gunshot wound he received while trying to apprehend an alleged cop killer.

I believe this Honorable Court recognizes that the lives of law enforcement officers and witnesses are something and the benefit to society is appreciated.

Because of Andrew Gordon I am no longer considered -- concerned just for my safety. Rather I had to sit my wife and my children down and address their safety. In essence they too became victims from this criminal and destructive behavior of Andrew Gordon, a depraved individual who could possibly bring harm not just to me but to my loved ones.

As a former member of the Marine Corps, a 12-year veteran of law enforcement, I suddenly realized I was a victim of the heinous acts of Andrew Gordon. It's not normal for me to sit down my spouse and tell her someone is trying to kill her husband and possibly our family. The very weight that I and so many other dedicated officers feel each day not knowing what lies ahead as we leave home, kiss our wives and children, suddenly became surreal.

Because of Andrew Gordon I had to have conversations with my young children that went beyond the normal stranger/danger context. I had to compromise the childhood innocence of my children when I explained to them that a bad guy wanted to hurt dad and they should be vigilant for any cars driving down the street which they didn't recognize as well as strangers who came near the house.

I also had to involve some of my neighbors and federal, state and local law enforcement and ask them to keep a watchful eye over my family during my frequent times away from the house. Because of my assignment with the Special Investigations Unit I worked days, nights, weekends and sometimes I'm gone for 24 hours at a time.

I understand there are inherent dangers associated with my line of work. I wholeheartedly accept that burden every time I put a badge and gun on to go to work but Andrew Gordon went beyond that of

what the Mafia's hands-off approach to harming members of law enforcement and their families, to Andrew Gordon everybody is fair game.

I believe Andrew Gordon represents the worst kind of criminal because he is one who wishes to pay others to do his bidding and dirty work. Even when I was acting in an undercover capacity, I told Mr. Gordon how I'd beat his wife with a crowbar, stab her, shoot her. He had no change of expression whatsoever. He didn't care because he doesn't care.

While incarcerated instead of being remorseful and realizing his wrongdoings, Andrew Gordon took it to a whole new level and plotted to get rid of the witnesses. Andrew Gordon does not think he is wrong. As matter of fact I believe he thinks everyone else but him is wrong.

He displays blatant ambivalence for the laws of the Commonwealth here in Massachusetts. He plotted to kill a witness, Frank Perlak, with complete disregard for the rest of his family, even for his wife who may have been in the house while the house was burnt down.

He plotted to kill me in the line of duty or at home with complete disregard for the safety and security of my wife and three children.

This Honorable Court has come to learn from the trial and the jury's verdict that Andrew Gordon is coldhearted criminal. As a victim I ask this Court to spare this man no mercy. With all due respect, I ask Your Honorable Court to impose on Andrew Gordon the maximum possible sentence under the law.

Sentencing Tr. at 15:13-20:7.

The Court also has before it a sealed letter from the defendant's ex-wife, who he also tried to have killed, detailing the lingering terror that the defendant's conduct continues to inflict on both her and her son's lives. As she writes, she lives in constant fear. "I take no comfort in his plan to live far from me—his plan to have me killed did not require proximity. If he is released, he has more than a million dollars in assets which would go a long way to hiring someone to hurt me again." Letter of Christine Gordon, filed under seal.

Finally, these are the Court's own words when imposing the original twenty year period of incarceration in June of 2016.

> It is perplexing about what's going on here. I don't understand it. You don't have a major mental illness. You're OCD, you have Obsessive Compulsive Disorder so I don't really understand what was possibly in your mind.
>
> There doesn't seem to be any remorse. I kept -- there are no letters from people supporting you. As your attorney says, there appear to be no friends, no supporters, no letters, no charitable involvement. It's actually quite unusual in the course of the[se] kinds of cases that I get. Even people who sell drugs or are in gangs, I see some mitigating something and I'm not seeing that here and so I am not inclined to vary. In fact, it wasn't asked of me. I am inclined to impose the sentence of, under all of this and given the fact that there were two victims and that's a pattern having to do with the wife and really the lack of any remorse that I have seen anywhere, I'm going to impose a sentence of 20 years to run, that's to run concurrent with the state sentence.

Sentencing Tr. At 33:19-34:12.

Extraordinarily, this defendant continues to believe he can outmaneuver everyone for his own benefit—including this Court.  Ironically, the defendant showed no compassion to his victims and yet he asks this Court to modify his sentence by engaging in continued manipulation and placing the dedicated medical professionals at FCI Butner at unnecessary risk.  The defendant does not deserve this Court's compassion.

IV.     <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully urges the Court deny the

defendant's motion.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

*/s/ Rachel Y. Hemani*
Rachel Y. Hemani
David G. Tobin
Assistant U.S. Attorneys


Dated:  June 16, 2020

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

By:     */s/ Rachel Y. Hemani*
Rachel Y. Hemani
Assistant U.S. Attorney

Dated: June 16, 2020